Michael F. RYAN, et al., Plaintiffs,

v.

DOW CHEMICAL CO., Monsanto Co., Hercules Inc., T.H. Agriculture & Nutrition Co., Inc., Diamond Shamrock Chemicals Co., Uniroyal, Inc., and Thompson Chemicals Corp., Defendants.

In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.

Shirley IVY, et al., Plaintiffs,

v.

DIAMOND SHAMROCK CHEMICALS CO., et al., Defendants.

Nos. 79 Civ. 747, 89 Civ. 3361.
MDL No. 381.

United States District Court,
E.D. New York.

Jan. 29, 1992.

Kelly L. Newman, Houston, Tex., for Clarence White.

Cadwalader, Wickersham & Taft, New York City, by Michael M. Gordon, for Diamond Shamrock Chemicals Co.

Clark, Gagliardi & Miller, White Plains, N.Y. by Lynn Pucino, for T.H. Agriculture & Nutrition Co., Inc.

Lord Day & Lord, Barrett Smith, New York City by John C. Sabetta, for Monsanto Co.

Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, N.Y. by Steven Brock, for Dow Chemical Co.

Shea & Gould, New York City by Myron Kalish, for Uniroyal, Inc.

Robert M. Hager, Washington, D.C., for Shirley Ivy.

## MEMORANDUM AND ORDER OF REMAND

WEINSTEIN, District Judge:

### TABLE OF CONTENTS

I.   Facts ........................................................... 937
     A. Supply of Herbicides to the United States ........................... 937
     B. Defendants' Removal Notice ....................................... 939
II.  Law of Removal ................................................... 939
     A. Pleading Requirements ............................................ 940
        1. Amendment of Removal Notice Upon Failure to Plead ............... 940
        2. Application of Law .............................................. 941
     B. 28 U.S.C. § 1442(a)(1) ........................................... 941
        1. History of § 1442 .............................................. 941
        2. Elements of § 1442(a)(1) ........................................ 944
           a. Colorable Claim to a Federal Defense .......................... 944
              [1] Government Contractor Defense ............................. 944
              [2] Defense Production Act ................................... 945
           b. Person Acting Under an Officer ................................ 945
              [1] Who Is a "Person"? ...................................... 946
              [2] When Is a Person "Acting Under" an Officer? ................ 947
        3. Application of Law .............................................. 950
III. Appeal of Remand ................................................. 952
IV.  Conclusion ....................................................... 953

Plaintiffs Charles Brown and Clarence White were civilians in Vietnam during the war. They claim injuries from exposure to herbicides produced by defendants and used by the United States Armed Forces. These suits (the civilian actions), which sound exclusively in state law, along with companion actions by veterans and their families (the veteran actions), were commenced in Texas state court collectively under the caption *Ivy v. Diamond Shamrock Chemicals Co.*, 89 Civ. 3361. *See also Hartman v. Diamond Shamrock*

*Chemicals Co.*, 90 Civ. 3928. The *Ivy* and *Hartman* actions were removed by the defendants to federal court in Texas and then transferred to this court by the Multidistrict Litigation Panel.

In *In re "Agent Orange" Product Liability Litigation*, 781 F.Supp. 902, (E.D.N.Y.1991), the veteran actions were dismissed because the plaintiffs in those actions were members of the class whose action was settled in 1984. Consideration of subject matter jurisdiction over the civilian actions was reserved. *See id.*

Pending before the court are two motions. The civilian plaintiffs have moved to remand their suits to Texas state court because there is no diversity of citizenship or other ground for federal jurisdiction. The defendants have moved to amend their notice of removal in the *Ivy* case to add 28 U.S.C. § 1442(a)(1) on the ground that they were acting under government orders when they supplied herbicides and were therefore entitled to removal under that provision. While amendment of the notice of removal is appropriate despite the defendants' failure to mention section 1442(a)(1) in their removal notice, defendants were not acting under government officials as required by that section. Remand is therefore required.

## I. FACTS

### A. *Supply of Herbicides to the United States*

The military use of Agent Orange and other chemical defoliants in the Vietnam war has been described elsewhere. *See e.g, In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 775–77 (E.D.N.Y.1984). Some basic facts bear repeating. These facts are discussed here for jurisdictional purposes only.

President Kennedy first approved the use of chemical defoliants in Vietnam toward the end of 1961, with actual spraying beginning the next year and lasting until 1971. *Id.* During this period, various chemical formulas were used under different names, such as Agent Purple and Agent Pink. The particular compound known as Agent Orange was used by United States forces between 1965 and 1971.

The theory of both the veteran and civilian actions is that when the United States sprayed these defoliants, it exposed the plaintiffs to dangerous levels of dioxin. Dioxin was an unwanted byproduct in the manufacture of the defoliants. Although dioxin had no herbicidal effect and was never listed as an ingredient in the defoliants, it appeared in varying amounts in the herbicides delivered by the defendants to the Defense Department. As affidavits from some defendants' employees indicate, the component elements of the herbicides delivered to the Defense Department, including the elements whose production generated dioxin, were developed and used long before the Vietnam war. *See, e.g., Affidavit of John P. Frawley* ¶ 2 (March 1980) (Hercules employee); *Affidavit of William J. McCarville* ¶ 4 (Dec. 10, 1991) (Monsanto employee); *Affidavit of Michael M. Gordon* ¶ 4 (Dec. 12, 1991) (Diamond Shamrock counsel); *see also In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 848–49 (E.D.N.Y.1984) (noting that Agent Orange was "closely related to 'shelf products' with which the chemical companies had a good deal of familiarity from the civilian market" and that "defendants had years of experience with the herbicide's components").

Initial use of chemical defoliants as weapons was relatively selective. In fiscal year 1965, for example, about 400,000 gallons of herbicides were used militarily, as compared to the 3.4 million gallons produced in the United States that year. W. Buckingham, *Operation Ranch Hand: The Air Force and Herbicides in Southeast Asia 1961–1971*, at 133 (1982). By

fiscal year 1966, however, the military use of defoliants had increased to 1.6 million gallons annually, and the Defense Department at that time projected that it would require Agent Orange in amounts that exceeded domestic production capacity. Those projections proved overstated, however, and by 1968 the perceived supply crisis had passed.

From the outset of the spraying program, federal officials, acting on behalf of the Defense Department, entered into contracts with the defendants for delivery of herbicides to the government. Most of these contracts—and all of the contracts for Agent Orange—were entered into pursuant to regulations issued by the National Production Authority (NPA) and its successor, the Business and Defense Services Administration (BDSA). The NPA and BDSA were the executive branch agencies within the Commerce Department charged with establishing regulations for obtaining materials necessary for military use under the Defense Production Act, 50 U.S.C. App. § 2061 et seq. (1988).

BDSA Regulation 2, at the time codified in 32A C.F.R. chapter VI, established a rating system by which different government orders for supplies were granted priority. From less to more urgent, the hierarchy ran: unrated orders, DO-rated orders, DX-rated orders, Mandatory Orders or Directives. See BDSA Reg. 2, §§ 3, 16. Section 10 of Regulation 2 established that all rated orders (whether DO- or DX–Rated) "must be accepted and filled regardless of existing contracts and orders," subject to certain exceptions. Section 16 of Regulation 2 made performance of all Mandatory Orders and Directives compulsory. Section 27 of Regulation 2 rendered violators of sections 10 and 16 subject to criminal fines or imprisonment.

At various times between 1962 and 1971, each of the defendants supplied Agent Orange to the government under DO-rated contracts. In 1966–1967, the expected shortage of Agent Orange caused the Ex-

ecutive Secretary of the BDSA to issue letters to the defendants requiring them to divert to the Defense Department what amounted to their entire civilian production of herbicides. For all orders, the government specified the chemical recipe for Agent Orange as well as the terms of its packaging and delivery. Government officials inspected defendants' production facilities. They also tested finished products to ensure compliance with contract specifications. As indicated above, however, the chemistry specified by the government was already being used by the defendants.

### B. Defendants' Removal Notice

After the civilian actions were commenced as part of the Ivy action in Texas state court, defendants removed to federal court. Section 1442(a)(1) of Title 28 was not mentioned in the initial notice of removal. Instead, the removal notices in both the Hartman and Ivy cases mentioned only "artful pleading," "federal question" and "federal preemption" grounds for removal. See In re "Agent Orange" Prod. Liab. Litig., 781 F.Supp. 902, (E.D.N.Y.1991). The removal notice did cite Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988),—a case outlining the federal common law military contractor defense—but only to support the "federal preemption" basis for removal. The issue of section 1442(a)(1)'s applicability was not explicitly raised until 1991, when defendants filed their motion for leave to amend their notice of removal under 28 U.S.C. § 1653.

### II. LAW OF REMOVAL

The federal officer removal statute allows executive branch officials and persons acting under them to remove to a federal court civil and criminal actions brought against them in a state court for their official acts. So far as relevant, the provision, 28 U.S.C. § 1442(a)(1), reads:

(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed

by them to the district court of the Unit-ed States for the district and division embracing the place wherein it is pending:

> (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office....

Section 1442(a)(1) is designed to prevent state courts from interfering with the implementation of federal law. The provision does so by allowing those whose federal activity may be inhibited by state court actions to remove to the presumably less biased forum of federal court. The provision confers federal subject matter jurisdiction over properly removed actions. *See Niagara Mohawk Power Corp. v. Bankers Trust Co.,* 791 F.2d 242, 244 (2d Cir.1986).

■ Under current Supreme Court case law, proper removal of an action under section 1442(a)(1) requires the satisfaction of two elements. First, the defendant must raise a colorable claim to a federal law defense. *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 966–69, 103 L.Ed.2d 99 (1989). Second, the defendant must establish that there is "a causal connection between what the officer has done under asserted official authority and the state prosecution." *Maryland v. Soper (No. 1),* 270 U.S. 9, 33, 46 S.Ct. 185, 190, 70 L.Ed. 449 (1926) (interpreting predecessor statute). To satisfy the causation element, the defendant must prove that the acts being sued upon were undertaken by a federal officer or "person acting under him," *Florida v. Cohen,* 887 F.2d 1451, 1453–54 (11th Cir.1989), and that those acts were under color of the relevant federal office. *Maine Ass'n of Interdependent Neighborhoods v. Commissioner,* 876 F.2d 1051, 1054 (1st Cir.1989).

■ Federal officials and their subordinates who satisfy these elements overcome the well-pleaded complaint rule of *Louisville & Nashville Railroad Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), and gain access to federal court where no federal question is presented by the plaintiff. *See Mesa,* 109 S.Ct. at 968. The right to remove is absolute, provided the proper procedures are followed. *Willingham v. Morgan,* 395 U.S. 402, 406, 89 S.Ct. 1813, 1815, 23 L.Ed.2d 396 (1969).

Defendants now claim to have been persons "acting under" federal officers within the meaning of section 1442(a)(1) when they contracted to sell, manufacture and deliver to the Department of Defense the herbicides that plaintiffs allege injured them. This contention raises close questions of procedural and substantive law. With respect to procedure, the issue is whether the defendants may now plead section 1442(a)(1) as a basis for jurisdiction, having failed to do so in their initial removal notice in the *Ivy* case. The substantive question is whether that portion of the defendants' conduct allegedly giving rise to plaintiffs' state law claims constituted acts under an officer within the meaning of section 1442(a)(1).

### A. *Pleading Requirements*

■ In removal cases, defendant bears the burden of showing that removal is clearly appropriate: "if the right to remove is doubtful, the case should be remanded." *Lance Int'l, Inc. v. Aetna Cas. & Sur. Co.,* 264 F.Supp. 349, 356 (S.D.N.Y.1967); *see also Roche v. American Red Cross,* 680 F.Supp. 449, 451 (D.Mass.1988) (noting accord with authorities from Fifth and Seventh Circuits).

#### 1. Amendment of Removal Notice Upon Failure to Plead

■ As applied to removal petitions, section 1653 allows parties to clarify pleadings after filing. It does not sanction the addition of new substantive allegations. *See Jacobs v. District Director of Internal Revenue,* 217 F.Supp. 104, 105 (S.D.N.Y. 1963); 14A C. Wright, A. Miller & E. Coo-

per, *Federal Practice and Procedure* § 3733, at 537–38 (2d ed. 1985) (after 30–day period for filing of removal notice, "petition may be amended only to set out more specifically grounds for removal that already have been stated, albeit imperfectly, in the original petition; new grounds may not be added and missing allegations may not be furnished") (citations omitted). To prevail on their motion, defendants must therefore show that the § 1442(a)(1) ground for removal was implicit in the original notices of removal.

An examination of cases that have allowed amendment of removal notices to include § 1442(a)(1) as a basis for removal reveals, as an initial matter, two loosely defined categories of cases: "mislabelling" and "lack of specificity" cases. In the former, a defendant asserts facts supporting a § 1442 removal, but then seeks removal under another statutory provision. In the latter, the defendant explicitly seeks § 1442 removal, but fails to specify the facts necessary to support such removal.

*Willingham v. Morgan,* 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), presents an example of a "lack of specificity" case. The prison officials in that case had explicitly sought § 1442(a)(1) removal on grounds of official immunity, yet failed to allege in the removal petition facts supporting the claim that the conduct upon which plaintiff was suing was under color of their office. Such facts were later alleged by defendants in affidavits in support of a motion for summary judgment. The Supreme Court treated these later, more specific, statements as having "amended" the petition for removal. *Id.* at 407 n. 3, 89 S.Ct. at 1816 n. 3.

By contrast, *Walker v. Gibson,* 604 F.Supp. 916 (N.D.Ill.1985), is an example of a mislabelling case. The issue of possible federal immunity was averred in the removal petition, which stated that defendant planned to argue that his actions were taken "as a federal official and within the scope of his employment." *Id.* at 918. The .defendants, however, sought removal under a provision inappropriate to the substance of the defense. The court allowed the defendants to relabel their removal petition. *Id.* at 919; *see also Bennett Constr. Co. v. Allen Gardens, Inc.,* 433 F.Supp. 825, 832 (W.D.Mo.1977) (although § 1442(a)(1) was not cited, removal under that section appropriate where there is no dispute that defendant was acting as Secretary of HUD); *Harlem River Produce Co. v. Aetna Cas. & Sur. Co.,* 257 F.Supp. 160, 164 (S.D.N.Y.1965) (failure to cite 28 U.S.C. § 1442 as a basis for removal is a mere technical defect where facts support removal under that section).

A hybrid approach that combines mislabelling and lack of specificity analysis to support liberal amendment of removal notices is illustrated by *National Audubon Society v. Department of Water & Power,* 496 F.Supp. 499 (E.D.Cal.1980), which relied in part upon the Supreme Court's review in *Willingham, supra,* of the entire case file, including affidavits, in order to determine whether the facts already known to the court brought the case within section 1442(a)(1). Various groups had sued the Los Angeles Department of Water and Power for harming the Mono Lake Basin by diverting water. The defendants then counterclaimed and filed a third-party complaint against the United States Forest Service and the Bureau of Land Management. The United States initially sought removal solely under federal question jurisdiction pursuant to 28 U.S.C. § 1441. Later, it sought to amend the petition to abandon the section 1441 claim and instead raise a section 1442 ground for removal. The court allowed the amendment despite the fact that the removal notice made no reference to section 1442 or to specific facts supporting section 1442 removal. Relying on *Willingham* and its inherent powers of judicial notice, it held that a court ought to "review the entire file to determine what the file fairly reflects at the time it considers the motion to amend." *Id.* at 503. On the basis of the facts in the file, the court

concluded that there were facts sufficient to warrant amendment and removal.

### 2. Application of Law

■ The facts of the instant case present either a borderline mislabelling case or a hybrid case that falls within the parameters of the *National Audubon* line. As indicated above, the *Ivy* removal notice on its face appears to have made only an oblique reference to the issue of whether the defendants could lay claim to the federal military contractor defense by citing the *Boyle* case. That reference takes on special meaning, however, when read in light of the history of the Agent Orange litigation, with which all parties and the court are quite familiar. It was and has been clear from the earliest stages of the litigation that, with respect to any action based on exposure to Agent Orange, the defendants would claim in their defense that they produced herbicides for military use under compulsion by federal officials. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 843–50 (E.D.N.Y. 1984) (discussing possible validity of government contractor and Defense Production Act defenses that defendants would raise absent settlement); *In re "Agent Orange" Prod. Liab. Litig.*, 91 F.R.D. 618, 620 (E.D.N.Y.1981) (denying summary judgment for defendants on basis of government contractor defense). Not surprisingly, the government compulsion argument formed the crux of the defendants' "federal question" and "federal preemption" claims. *See, e.g., Defendants' Memorandum of Law in Response to Plaintiff's Motion to Remand*, at 12–15 (Dec. 14, 1990).

In light of the defendants' claim to have been acting under federal officers, consistently maintained through a decade of Agent Orange litigation, there was sufficient evidence before the court in the notice of removal and the case file to permit amendment of the defendants' removal notice to include a section 1442(a)(1) claim. An analysis of the substance of that section is therefore required.

### B. *28 U.S.C. § 1442(a)(1)*

#### 1. History of § 1442

To understand the scope of section 1442(a)(1), some historical context is required. Section 1442 has several predecessors. *See Willingham*, 395 U.S. at 405–06, 89 S.Ct. at 1815; P. Bator, D. Meltzer, P. Mishkin & J. Shapiro, *Hart and Wechsler's The Federal Courts and The Federal System* 1057–60 (3d ed. 1988); Rosenblatt, *Removal of Criminal Prosecutions of Federal Officials: Returning to the Original Intent of Congress*, 29 Santa Clara L.Rev. 21, 28–41 (1989). Its earlier incarnations were drafted to protect officials who faced state government resistance to specific federal laws. The concern underlying each, however, has been the same: that state governments hostile to duly enacted federal laws would be able to frustrate the implementation of those laws by bringing (or allowing to be brought) civil or criminal actions in state court against the federal officials responsible for their implementation. Although the Supreme Court can assist in the protection of federal interests by reviewing decisions of state courts, *see Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 350, 4 L.Ed. 97 (1816), Congress has found it expedient in certain instances to allow officials sued in state courts to remove immediately to the federal courts.

The first executive officer removal statute was passed in 1815. Following the War of 1812, Vermont sought to skirt a national trade embargo against Britain by limiting the extent to which federal customs officials could delegate their authority to conduct inspections. Subordinate inspectors lacking specific authorization for their searches were subject to civil liability. *See* Rosenblatt, *supra*, at 29–30. In response, Congress passed a statute allowing for removal of suits "against any collector, naval officer ... or any other person aiding or assisting," for any actions undertaken within the scope of the officer's duties. *Id.* at 31.

The need for an officer removal statute arose again during the nullification controversy that preceded the Civil War. In 1832, South Carolina authorized the criminal prosecution of federal tariff collectors. Congress responded by providing for removal of any "suit or prosecution" against an officer "or other person" acting pursuant to federal customs laws. *Id.* at 34. For the duration of the Civil War itself, Congress expanded removal to include suits against any civil or military officer or any other person acting "by virtue or under color of any authority derived from or exercised by or under" the President or Congress. *Id.* After the Civil War, several versions of a removal statute designed to protect federal revenue officers performing duties pertaining to internal revenue collection were enacted. *See id.* at 36.

In the 1860s and 1870s, Congress granted similar protections to persons owning property pursuant to federal law and to members of Congress for acts performed in the course of their duties. *See id.* at 38 n. 64, 39. These provisions and those protecting federal revenue officers were combined in section 33 of the Judicial Code of 1911, codified at the time at 28 U.S.C. § 76. The 1911 statute was amended in 1916 to extend the power of removal to judicial officers faced with suits based on their official actions. *See, e.g., Gay v. Ruff,* 292 U.S. 25, 27 n. 1, 54 S.Ct. 608, 609 n. 1, 78 L.Ed. 1099 (1934).

The accumulation of specific protections for officials in each of the three branches culminated in 1948 with the enactment of section 1442(a). Section 1442(a)(1)–(4) incorporated the protections that section 33 afforded to executive, legislative and judicial officials. In addition, the present language of section 1442(a)(1) was adopted, which granted removal to *any* executive branch officer or "person acting under him" rather than just to revenue officers. 28 U.S.C. § 1442 (1988) Historical and Revision Notes.

The federal officer removal statute thus saw continuous expansion between 1815

and 1948. Nevertheless, the underlying rationale of its various incarnations has been constant.

The series of enactments culminating in Section 1442(a) were initially designed to protect Federal revenue officers from prosecution or civil suit in State Court for violations of State law. Removal was restricted to cases where the officer[']s defense was that no personal liability, civil or criminal, could be attached to his action, since he was only performing his Federal duties.

Subsequent amendments have, from time to time, enlarged the class of Federal officers and employees who might claim protection, but these additions have left unchanged the basic theory and purpose of the removal privilege: that the officer was entitled to—and the interest of national supremacy required—his protection in actions brought against him which attacked and threatened him with personal liabilities or penalties.

*New Jersey v. Moriarity,* 268 F.Supp. 546, 555 (D.N.J.1967) (citations omitted).

*Willingham v. Morgan,* 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), is the leading Supreme Court case interpreting section 1442(a)(1). *Willingham* held that federal prison officials sued by a prisoner for alleged mistreatment were entitled to § 1442(a)(1) removal because they maintained a colorable claim to a defense of official immunity. Reviewing the history of § 1442(a), the Court concluded that the purpose of the modern statute, despite its expansion over its predecessors, was essentially that outlined in *Tennessee v. Davis,* 100 U.S. 257, 25 L.Ed. 648 (1879). *Davis* interpreted the 1866 version of the revenue officer's removal statute to allow removal of the murder prosecution of a deputy revenue collector who killed a man while attempting to seize an illegal distillery:

[The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested

and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the general government may at any time be arrested at the will of one of its members.

*Id.* 100 U.S. at 263 (quoted in *Willingham,* 395 U.S. at 406, 89 S.Ct. at 1815).

Section 1442(a)(1), the *Willingham* Court noted, ultimately rests on the Supremacy Clause, i.e., "the very basic [federal] interest in the enforcement of federal law through federal officials." *Willingham,* 395 U.S. at 406, 89 S.Ct. at 1816. Accordingly, it should not be given "a narrow, grudging interpretation." *Id.* at 407, 89 S.Ct. at 1816. Rather, it is applicable *"at the very least"* in "all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 406–07, 89 S.Ct. at 1816 (emphasis added).

*Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), signalled a narrowing of section 1442. Two mail carriers were charged by California with crimes relating to their operation of mail trucks. The defendants successfully removed to federal court even though they were not able to claim official immunity. *Id.* 109 S.Ct. at 961–62. The Court remanded, and, contrary to *Willingham,* found it necessary to emphasize the limited scope of 1442(a)(1). With one possible narrow exception, *see id.* 109 S.Ct. at 966, a defendant seeking removal under § 1442(a)(1) must now allege a federal law defense. *Id.* at 966–67. The Court thereby closed, without locking, the window left open by *Willingham's* "at the very least" language.

The restrictive approach in *Mesa* reflects concern by the Court over the rapid expansion of federal court jurisdiction. Between the time of *Willingham* and *Mesa,* for example, the courts found section 1442(a)(1)

conferred jurisdiction in a broad array of cases well outside the paradigm case of the individual official being intimidated by the threat of civil or criminal prosecution in state courts. *See* cases discussed in Part II.B.2.b *infra.* In this respect, *Mesa* is in keeping with other recent decisions in which the Court has found it appropriate to limit federal court encroachment on state court jurisdiction. *See, e.g., Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (federal district court in New York lacks authority to enjoin enforcement of Texas state court judgment pending state court appeals).

On the heels of *Mesa* came the further restriction of section 1442(a)(1) removal in *International Primate Protection League v. Administrators of Tulane Educational Fund,* —— U.S. ——, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991). Rejecting the view of some circuits, the Court held that state court suits naming only a federal agency (rather than a particular official) as defendant were not removable under § 1442(a)(1) because a federal agency was neither an "officer of the United States" nor a "person acting under him." Justice Marshall, who twenty-two years earlier had authored *Willingham,* emphasized the limited focus of section 1442 by holding that the statute ought to be interpreted as if it reads "officer of the United States or *of* an agency thereof."

The Court also reasoned that, in protecting officials rather than agencies, Congress sought to distinguish lawsuits on the basis of their susceptibility to state court manipulation. Congress wished to protect individual officials because, typically, they would be relying on an official immunity defense, a type of defense "fraught with difficulty and subject to considerable manipulation." *Id.* 111 S.Ct. at 1709. By contrast, suits against agencies are more straightforward, leaving hostile state courts with less room to discriminate.

### 2. Elements of § 1442(a)(1)

#### a. *Colorable Claim to a Federal Defense*

*Mesa* requires in the first instance that defendants assert a federal defense. *Mesa*

*v. California,* 489 U.S. 121, 109 S.Ct. 959, 966–67, 103 L.Ed.2d 99 (1989). The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made. *Id.* 109 S.Ct. at 966.

Defendants aver a colorable claim to two federal defenses: the federal common law "government" or "military contractor" defense, *see Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and the liability-limiting provisions of the former Federal Defense Production Act, 50 U.S.C. App. § 2071 (1988).

**[1]** *Government Contractor Defense*

■ With respect to the production of Agent Orange, the government contractor defense allows a defendant who manufactures products at the direction of the federal government to escape tort liability for harms caused by those products "so long as it informs the government of known hazards or the information possessed by the government regarding those hazards is equal to that possessed by the contractor." *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 187, 190 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988). The doctrine thus provides protection to manufacturers not at fault, safeguards the procurement process, and prevents the courts from second-guessing executive branch procurement strategies. *See id.* at 191.

In *Boyle,* the Supreme Court further shaped the contours of this defense, holding that it preempts state product liability law for design defects whenever: (1) the United States approved reasonably precise specifications for the contracted-for equipment; (2) the equipment produced conformed to those specifications; and (3) the equipment supplier warned the United States about possible dangers presented by the equipment that were known to the supplier but not to the United States. *Boyle,* 108 S.Ct. at 2518.

There is considerable question as to whether the military contractor defense amounts to a defense of official immunity, or even to a defense at all. Generally, the Supreme Court has been reluctant to expand the federal common law of official immunity in the absence of specific congressional legislation. *See Boyle,* 108 S.Ct. at 2523–24 (Brennan, J., dissenting). This is because "official immunity comes at a great cost," and thus "absolute immunity for federal officials is justified only when 'the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens.'" *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988) (quoting *Doe v. McMillan,* 412 U.S. 306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973)).

In *Boyle,* the Court refused to characterize its preemption analysis as extending official immunity to government contractors. *See Boyle,* 108 S.Ct. at 2514 n. 1. In fact, the majority took pains not to disagree with the dissent's claim that official immunity has never been understood to extend to contractors acting independently of any congressional enactment. *See id.; id.* at 2524 (Brennan, J., dissenting). Most relevant to the issue of § 1442(a)(1) removal, the *Boyle* dissent noted that "a grant of immunity to Government contractors could not advance 'the fearless, vigorous, and effective administration of policies of government' nearly as much as does ... immunity for Government employees." *Id.* at 2524 (Brennan, J., dissenting) (quoting *Barr v. Matteo,* 360 U.S. 564, 576, 79 S.Ct. 1335, 1342, 3 L.Ed.2d 1434 (1959) (plurality opinion)). It is, of course, the vigorous pursuit of policy by government officials that section 1442(a)(1) is designed to protect.

■ The defendants themselves question whether the military contractor defense is best understood as a defense. The defendants now regard the doctrine as a form of official immunity which entitles them to section 1442(a)(1) removal. Previously, in their attempt to remove on the basis of federal question jurisdiction, the defendants had cast the military contractor de-

fense as a liability standard. Citing previous *Agent Orange* cases, the defendants noted that the military contractor "defense" is "conceptually better seen as part of the basis of liability." *Defendants' Memorandum of Law in Response to Plaintiffs' Motion to Remand* at 12 (Dec. 14, 1990) (citing *In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 843 (E.D.N.Y.1984)). On this view, the military contractor defense—which provides that a contractor must inform the government of any dangerous consequences of using its product of which the government does not know—establishes not a defense but a federal common law standard of care that must be met to avoid liability.

## [2] *Defense Production Act*

■ If defendants were relying solely on the federal common law military contractor "defense," there would be a question as to the existence of the colorable claim to a federal defense required by *Mesa*. They have, however, also pled reliance on section 707 of the Defense Production Act. *See* 50 U.S.C. App. § 2061 *et seq.* (1988). The Act, which expired by its terms in 1990, *see id.* § 2166, was passed in 1950 at the outset of the Korean war to ensure governmental access to materials necessary for the war effort. Section 707 of the Act immunized contractors who were forced under threat of criminal sanction to perform contracts for the Defense Department from certain liabilities stemming from the performance of those contracts. In relevant part, it provided:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act....

*Id.* § 2157. Defendants argue that section 707 provides the basis for a federal defense sufficient to support removal under *Mesa*.

The defendants make out a colorable claim to the protection of section 707. There is no dispute that Agent Orange was delivered to the United States for use in Vietnam under orders issued pursuant to the Act. *See* Part I.A, *supra; In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 844 (E.D.N.Y.1984). There is a dispute as to whether section 707 provides immunity against tort suits based in strict liability and negligence of the sort the civilian plaintiffs now wish to pursue. On a previous occasion, this court was inclined to view section 707 as immunizing contractors only for contract damages, although it did not rule on the issue. *Id.* at 844–45. For purposes of satisfying section 1442(a)(1), however, the defendants need not establish a meritorious federal defense, only a colorable claim. This burden has been met.

### b. *Person Acting Under an Officer*

That defendants can make out a colorable claim to a federal defense does not end the inquiry. Satisfaction of the causation element of § 1442—that defendants were officers or persons "acting under" officers and that they were acting under color of office—is also required. In other words, the set of defendants who can avail themselves of section 1442(a) is smaller than the set of defendants who can make a colorable claim to a federal defense. Moreover, the set of defendants whose federal defense is that state law must give way to contrary federal law is smaller than the set of defendants who can rely on 1442(a)(1). *See, e.g., Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (defendants asserting federal preemption defenses are ordinarily not entitled to removal).

In cases like this where the defendant claims to have been a "person acting under" an officer, analysis of the two parts of the causation element tends to converge into a single inquiry: whether the defendants are being sued "based upon actions taken pursuant to federal direction." *Gulati v. Zuckerman*, 723 F.Supp. 353, 358 (E.D.Pa.1989). Defendants must prove the existence of a "federal nexus" between the actions for which they are being sued and the directives of federal officers. *See, e.g., Lowe v. Norfolk & W. Ry.*, 529 F.Supp. 491, 495 (S.D.Ill.1982) (company hired by

railroad to clean chemical spill cannot remove indemnity action brought by railroad based on allegation that it cleaned pursuant to EPA regulations; EPA did not direct clean up and a "federal nexus" was otherwise lacking). Critical under the statute is "to what extent defendants acted under federal direction" at the time they were engaged in the conduct now being sued upon. *Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.,* 358 F.Supp. 841, 844 (S.D.N.Y.1973); *see also Northern Colo. Water Conservancy Dist. v. Board of County Comm'rs,* 482 F.Supp. 1115, 1117–19 (D.Colo.1980) (where federal agency exercised only the power to approve or disapprove pollution control plans developed by local governmental entities facing suits concerning content of plans, entities were not "acting under" officers; requisite nexus of control was lacking).

### [1] *Who Is a "Person"?*

■ The Supreme Court has held that section 1442(a)(1)'s use of the phrase "person acting under" was not meant to include government agencies. *International Primate Protection League v. Administrators of Tulane Educ. Fund,* — U.S. —, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991); *see also Mignogna v. Sair Aviation, Inc.,* 937 F.2d 37, 40–41 (2d Cir.1991) (applying *Primate Protection League*). The Court did not decide, however, whether a corporation could be a "person acting under [an officer]." *Bakalis v. Crossland Sav. Bank,* 781 F.Supp. 140, 142–43 (E.D.N.Y.1991). Federal courts are divided on the question. *Compare C.H. v. American Red Cross,* 684 F.Supp. 1018, 1023–24 (E.D.Mo.1987) ("person" in 1442(a)(1) refers to natural person) *and Roche v. American Red Cross,* 680 F.Supp. 449, 455 (D.Mass.1988) (same) *and Gensplit Fin. Corp. v. Foreign Credit Ins. Ass'n,* 616 F.Supp. 1504, 1508–10 (E.D.Wis.1985) (same) *with Peterson v. Blue Cross/Blue Shield,* 508 F.2d 55, 58 (5th Cir.) ("person" not limited to natural person), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975); *Bakalis,*

781 F.Supp. at 143–44 (same); *Group Health Inc. v. Blue Cross Ass'n,* 587 F.Supp. 887, 890 (S.D.N.Y.1984) (same).

Determining in a vacuum what the term "person" is meant to encompass seems a fruitless exercise. The statute's use of the word could refer to either natural or legal persons. Legislative history is equally unilluminating. Although as a historical matter it seems plausible to believe that the drafters were concerned with protecting natural persons, there is almost no recorded history for the provision, and none to warrant reliance on such an intuition.

Given the arid interpretive landscape, it would seem more productive to address a slightly different question, namely, what definition of person makes sense in light of the purpose of the section read as a whole. Thus recast, the issue is whether a purely legal person such as a corporation could be engaged in activities that amount to the implementation of a federal policy under the direction of a government officer in such a manner that state court suits against corporations arising out of those activities could be a direct interference with the implementation of federal law.

It is not difficult to imagine such a circumstance. Consider, for example, the case of federal agents ordering a private telephone company to intercept and record the phone conversations of a suspected criminal pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–20. In a civil or criminal action against the company (e.g., for invasion of privacy or trespass), the telephone company arguably qualifies for removal under section 1442(a)(1) as a person acting under an officer, not merely because Congress has seen fit to grant such companies immunity for actions taken pursuant to Title III, but also because the company was acting directly on the orders of a federal officer and it is plausible, particularly in the case of a criminal prosecution, that a state might attempt to discourage the implementation of Title III. *Cf. Camacho v. Autoridad de Telefonos,* 868 F.2d 482 (1st Cir.1989); *Manufacturers Int'l, Ltda. v.*

*Manufacturers Hanover Trust Co.,* 1992 WL 42921 (E.D.N.Y. Feb. 27, 1992).

### [2] When Is a Person "Acting Under" an Officer?

Having concluded that corporations can be persons within the meaning of section 1442(a)(1), the question remains whether defendant corporations such as those which produced Agent Orange are persons acting under a federal officer so as to warrant removal under section 1442(a)(1).

■ An examination of previous cases in which private corporations and individuals have been allowed removal under section 1442(a)(1) is helpful in establishing the indicia of official control necessary to warrant removal. The rule established is that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Cf. Bakalis v. Crossland Sav. Bank,* 781 F.Supp. 140, 144–45 (E.D.N.Y.1991) ("The rule that appears to emerge from the case law is one of 'regulation plus ...'."). By contrast, a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal office or officer is not entitled to section 1442(a)(1) removal. Likewise, the mere fact that a corporation participates in a regulated industry is insufficient to support removal absent a showing that the particular conduct being sued upon is closely linked to detailed and specific regulations. *Bakalis,* 781 F.Supp. at 144–45. Between these extremes on the "acting under" spectrum there will, of course, be numerous close calls.

*Camacho v. Autoridad de Telefonos,* 868 F.2d 482 (1st Cir.1989), as was suggested by the preceding hypothetical example, is close to the "direct and detailed orders" end of the spectrum. Several residents of Puerto Rico sued quasi-public telephone companies for violations of their civil rights caused by phone taps. The defendants' removal petition was granted because the wiretaps were authorized by federal agents under 18 U.S.C. §§ 2510–20. As the court noted: "'at all times ... defendants ... were acting under express orders, control

and directions of federal officers ... '" *id.* at 486 (quoting from removal petition), and the defendants' involvement was "strictly and solely at federal behest." *Id.*

By contrast, a case well away from the direct and detailed orders end of the spectrum is *Lovell Manufacturing v. Export–Import Bank,* 843 F.2d 725 (3d Cir.1988). Plaintiff brought suit in state court against an association of private insurers acting as an agent through which the Export–Import Bank of the United States insured plaintiff's political risks. Although the Court of Appeals did not rule on the defendant's attempt to remove under section 1442(a)(1), it noted that

> it is not at all clear that a mere agency-principal relationship ... would be sufficient to support jurisdiction.... After all, the purpose of § 1442 removal is to protect federal officials from unfriendly state forums, to allow the official to raise defenses (such as immunity) arising out of his official duties, and to insure an impartial setting "free from local interests or prejudice." ... It is doubtful whether removal here would serve any of these purposes.

*Id.* at 734 n. 13 (citation omitted).

The majority and dissenting opinions in *North Carolina v. Ivory,* 906 F.2d 999 (4th Cir.1990), disagree about the facts of the case and therefore as to where on the spectrum the case belongs. North Carolina brought criminal charges against a United States Marine driving in a military convoy whose truck collided with a civilian vehicle, killing the civilian driver. The majority thought removal was not warranted in part because the driver's allegedly actionable conduct was not taken pursuant to specific orders. *Id.* at 1003 (finding absence of any order to driver to keep his truck close to others in convoy). The dissent thought the facts warranted the opposite conclusion. *Id.* at 1007 (Phillips, J., dissenting) (finding that defendant was acting under direct orders). Implicit in this disagreement was an agreement on the law of section 1442(a)(1): a person is only "acting under" a federal officer when under the direct and specific control of that officer.

*Texas v. National Bank of Commerce,* 290 F.2d 229 (5th Cir.), *cert. denied,* 368 U.S. 832, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961), concerned removal of suits in which Texas brought a *quo warranto* action against private banks serving United States military installations. The Court of Appeals for the Fifth Circuit found removal appropriate in part because the banks operated only through the exercise of powers enumerated in Treasury Department letters. *See id.* at 231. The banks, moreover, filed monthly reports with the Treasury Department, *id.* at 231–32, which regularly reviewed each facility and retained the power to close the banks at will. *Id.* at 231. In short, removal under § 1442(a)(1) was appropriate because Texas was using its state courts to raise a direct challenge to the banking power of the national government by bringing suits against banks under exclusive and direct government control.

Distinguishable from *State of Texas* because federal control of the defendant bank was peripheral to the case is *First National Bank v. Aberdeen National Bank,* 627 F.2d 843, 848 n. 13 (8th Cir.1980). Plaintiff sued for unfair competition based on the resemblance of defendant's name to its own. Defendant's only claimed basis for removal was that the Comptroller of the Currency had approved its new name, thereby rendering the bank a person acting under an officer.

Another Fifth Circuit case, *Noble v. Employers Insurance,* 555 F.2d 1257 (5th Cir. 1977), illustrates a case properly removed under section 1442(a)(1). A patient at a Veterans Administration hospital sued the insurer of a surgeon employed by the VA under the Louisiana Direct Action Statute. The Court of Appeals, treating the suit as if it were brought directly against the insured surgeon, found that the surgeon was a person acting under an officer because the surgeon had acted under the immediate supervision of the Administrator of Veteran Affairs, who evaluated the surgeon's performance and determined his hours and working conditions pursuant to federal statute. *Id.* at 1258–59.

*Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.,* 358 F.Supp. 841 (S.D.N.Y.1973), suggests what would be the Second Circuit's view of the "person acting under" provision of section 1442(a)(1). The *Gurda* court authorized the removal of assault and trespass actions against attorneys who had committed the alleged torts while acting on behalf of migrant farm workers. The decision was based upon a finding that the attorneys were governed by "exceedingly complex regulations, guidelines, and evaluation schemes," *id.* at 844, affecting the attorneys' conduct on " 'a day to day basis.' " *Id.* at 845 (quoting defendant's affidavit). Given this level of official control, the court found removal in line with cases allowing removal by private parties being sued for actions ordered by specific officers or regulations. *See id.* at 843–44 (citing, *inter alia, Texas v. National Bank of Commerce, supra* (private banks acting under powers enumerated by federal authorities); *Oregon v. Cameron,* 290 F.Supp. 36, 36 (D.Or.1968) (VISTA employees subject to government control by "clear" chain of command); *Teague v. Grand River Dam Auth.,* 279 F.Supp. 703, 704 (N.D.Okla. 1968) (dam operator acting pursuant to detailed orders and regulations regarding appropriate responses to changes in water levels); *Colorado v. Maxwell,* 125 F.Supp. 18 (D.Colo.1954) (police chief acting under order of Air Force Captain)). Several subsequent decisions have relied on *Gurda's* analysis. *See Dixon v. Georgia Indigent Legal Servs., Inc.,* 388 F.Supp. 1156, 1161–63 (S.D.Ga.1974) (facts almost identical to *Gurda*), *aff'd without opinion,* 532 F.2d 1373 (5th Cir.1976); *Swan v. Community Relations–Social Dev. Comm'n,* 374 F.Supp. 9, 10, 11 n. 1 (E.D.Wis.1974) (quasipublic corporation operating under same officials as defendants in *Gurda*); *cf. McGlynn v. Employers Commercial Union Ins. Co.,* 386 F.Supp. 774, 777 (D.P.R. 1974) (private insurer of United States Navy not acting under officer with respect to suit brought under direct action statute; *Gurda* distinguished on facts).

*Gulati v. Zuckerman,* 723 F.Supp. 353 (E.D.Pa.1989), which bears some resemblance to the instant case, succinctly states the appropriate standard for section 1442(a)(1) removal. In *Gulati,* a defense contractor and its employees were sued for defaming the corporation's former president in various documents, including reports required by Department of Defense regulations and issued in response to the specific inquiries of Department officials. The court held that insofar as the defamation action was "based upon actions taken pursuant to federal direction," it was appropriately removed. *Id.* at 358; *cf. Kaplansky v. Associated YM–YWHAs,* No. 88–1292, 1989 WL 29938, at *1–*3, 1989 U.S. Dist. LEXIS 3062, at *4–*8 (E.D.N.Y. Mar. 27, 1989) (defendant sued for allegedly libelous statements made in response to federal grand jury subpoena was not acting under federal officer).

Defendants in suits against private companies acting as fiscal intermediaries for the federal Medicare program have been found entitled to removal under section 1442(a)(1). *See Peterson v. Blue Cross/ Blue Shield,* 508 F.2d 55 (5th Cir.), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975); *Neurological Assocs. v. Blue Cross/Blue Shield,* 632 F.Supp. 1078 (S.D.Fla.1986); *Group Health Inc. v. Blue Cross Ass'n,* 587 F.Supp. 887 (S.D.N.Y.1984); *see also Kuenstler v. Occidental Life Ins. Co.,* 292 F.Supp. 532 (C.D.Cal.1968); *Allen v. Allen,* 291 F.Supp. 312 (S.D.Iowa 1968). Intermediaries perform the day to day work of administering an ongoing federal program under strict official oversight. For example, an insurer is held to various "performance criteria," the satisfaction of which are necessary if the insurer is to maintain its status as an intermediary. *See* 42 C.F.R. § 421.120–124 (1990).

Typical of these cases is *Neurological Associates.* The plaintiff challenged the suspension of payments by a private company acting as a Medicare intermediary. Removal was appropriate because the suspension was ordered directly by officials at the Department of Health and Human Ser-

vices. *Neurological Associates,* 632 F.Supp. at 1079. *Peterson* and *Group Health* also emphasize that private companies acting as Medicare intermediaries carry out the duties of the Secretary of Health and Human Services pursuant to extensive and specific federal regulations. *See Peterson v. Weinberger,* 508 F.2d 45, 51 & n. 7 (5th Cir.) (companion opinion to 508 F.2d 55), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975); *Group Health,* 587 F.Supp. at 889, 891. When read against the background of the closely integrated system of officials and private intermediaries, *Peterson* and *Group Health* do not, as defendants in this case contend, support section 1442(a)(1) removal solely on the basis of a defendant "acting pursuant to a contract with the government." *Peterson v. Blue Cross/Blue Shield,* 508 F.2d at 58; *see Bakalis v. Crossland Sav. Bank,* 781 F.Supp. 140, 145 (E.D.N.Y.1991) ("*Group Health* ... allows private corporations to remove only when the corporation is so intimately involved with government functions as to occupy essentially the position of an employee of the government.").

*District of Columbia v. Landmark Services, Inc.,* 411 F.Supp. 1002 (D.D.C.1976), represents a potentially extreme application of section 1442(a)(1) that is perhaps best explicable on the basis of the special statutory language there at issue. The District of Columbia sued to enjoin the operation of a bus company providing tours of parts of Washington, D.C. because of the company's failure to comply with District licensing and registration provisions. The company sought removal on the ground that it was operating pursuant to a contract with the Department of Interior which, in turn, had been specifically authorized by Congress to contract for such tours. *See id.* at 1003 (citing 40 U.S.C. § 804). Under the terms of the authorizing legislation, any tour services for which the Secretary of the Interior arranged were "deemed transportation by the United States and shall be under the sole and exclusive charge and control of the Secretary." *Id.*

The court found that the bus company was entitled to removal because the authorizing legislation appeared to confer official immunity on the bus company by deeming it to be part of the United States government. The case is unusual because, although the court treated the bus company as a "person acting under" a federal officer, the decision appears to have turned on statutory language that essentially rendered the bus company a federal officer.

### 3. Application of Law

■ Even from the brief recitation of facts provided in part I.A *supra,* it is apparent that some of the defendants' actions with respect to Agent Orange and other herbicides were under the direct and detailed control of various government officers including the Executive Secretary of the BDSA. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740, 775, 849 (E.D.N.Y.1984); *see also Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1370 (E.D.N.Y.1988) (describing control exercised by government over one defendant's production of Agent Orange). The defendants were, in this respect, compelled under threat of criminal sanction to deliver Agent Orange produced according to government specifications to the Defense Department.

While these facts are clear, they are not, as defendants contend, dispositive. The issue is not simply whether the defendants acted under Commerce and Defense Department officials, but whether they are in danger of being sued in state court "based upon actions taken pursuant to federal direction." *Gulati v. Zuckerman,* 723 F.Supp. 353 (E.D.Pa.1989). Defendants are faced with suits sounding in common law strict liability, products liability, negligence, and implied warranty as well as statutory causes of action for breach of express warranty and the Texas Deceptive Trade Practices Act. The gist of these actions is that Agent Orange and other chemical herbicides were improperly designed and produced because they contained trace elements of dioxin. In this regard it is necessary to recall that Agent Orange was a mix of pre-existing chemical formulae that had long been put to domestic commercial use to reduce unwanted vegetation along roads and railroad tracks and on farms. The government bought the chemical components for Agent Orange and other defoliants as existing products privately developed and used them in mixtures which were derived from defendants' standard recipes. Thus, the "compulsion" under which the defendants operated predominantly concerned marketing rather than design and manufacture.

Although the case presents a close question, the defendants have not met the requirements of section 1442(a)(1). They are being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by the defendants. Although the defendants later produced and delivered Agent Orange under the control of federal officers, these subsequent acts are distinct from the earlier acts of product and manufacturing design being sued upon. The government sought only to buy ready-to-order herbicides, not to cause, control, or prevent the production of the unwanted byproduct, dioxin, which is the alleged cause of plaintiffs' injuries. The necessary direct and detailed official control over the acts for which the defendants are now being sued is therefore lacking.

Consideration of the purposes of section 1442(a)(1) supports this result. Defendants' removal petition raises the question: does the adjudication of a product liability suit in Texas state court against companies that sold prefabricated component parts to the federal government amount to a threat to the enforcement of federal policy sufficient to warrant removal? There is little or no outward indication that the civilian actions could be a direct or indirect manifestation of Texas's eagerness to inhibit federal policy. Arguably there is no extant federal policy to thwart, save for the generalized federal interest in ensuring that future Defense Department procurement not be

hindered. *Cf. Murray v. Murray,* 621 F.2d 103, 107 (5th Cir.1980) (suit by divorcee to garnish income owed to ex-husband by Veterans Administration not removable where there is no showing "how the pendency and disposition of the garnishment action in state court could arrest, restrict, impair, or interfere with either the actions of a federal official or the operations of the federal government").

Protection of future procurement is a matter readily dealt with by federal statute or government contractual indemnification. Suppose, however, that the civilian actions were to expose the government to an increase in the cost of future procurement of chemicals for military use. The Supreme Court has recognized a distinct federal interest in protecting future defense procurement, *see Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 2514–15, 101 L.Ed.2d 442 (1988), and one purpose of the government contractor defense is to protect that interest. *Id.* But the hypothesis that tort liability will result in increased procurement costs, while sufficient to establish the presence of a federal interest in these cases, does not support the claim that a state cannot fairly adjudicate cases in which that interest is at issue. It is the concern for state court bias against the federal government that is the ultimate justification for section 1442(a)(1) removal.

From the standpoint of federalism, the mere assertion of a nebulous federal procurement interest cannot, without further specification, be a basis for removal. Otherwise any state suit against a manufacturer whose product has at one time been diverted and adapted for military use—for example, a nuisance suit against a metal foundry—would potentially be subject to removal, seriously undercutting the power of the state courts to hear and decide basic tort law. Such a result is incompatible with the respect owed to state courts under our federal system.

The point is not that section 1442(a)(1) is necessarily inappropriate to protect the enforcement of federal procurement policy. It is that removal is not appropriate when

the civil or criminal suit brought in state court has only a speculative impact on such policy. In this respect the defendants are in an altogether different position from the private insurers which, as Medicare intermediaries, have relied on section 1442(a)(1). *See* cases cited in Part II.B.2.b., *supra.* The insurers act as continuing conduits for government policy and the state court lawsuits had the potential to interfere with an ongoing federal program. The defendants, by contrast, are being sued entirely for past acts in allegedly providing a tainted product to the government.

Remanding the civilian actions also comports with the Supreme Court's most recent treatment of section 1442(a)(1), which found removal appropriate where the claimed federal defense of immunity raises issues "fraught with difficulty and subject to considerable manipulation." *International Primate Protection League v. Administrators of Tulane Educ. Fund,* —— U.S. ——, 111 S.Ct. 1700, 1709, 114 L.Ed.2d 134 (1991). The military contractor defense raises straightforward common law tort issues that the state courts are as adept at handling as the federal judiciary. Likewise, the Defense Production Act issue turns on basic questions of statutory interpretation.

Implicit in the parties' arguments is their assumption that, on remand, the civilian plaintiffs might obtain a judgment or settlement in a Texas state court in excess of that received by veterans whose actions were settled in 1984. Such a result might be seen by some as but another denigration of the Vietnam veteran. Others would argue that what is more accurately revealed is the special responsibility of a nation's political bodies for its returning soldiers. As Judge Cardozo advised, courts may "take judicial notice ... that since the beginnings of our history, a sense of the moral obligation to give aid to the returning soldier has been felt and acted on by government." *New York v. Westchester County Nat'l Bank,* 231 N.Y. 465, 486, 132 N.E. 241 (1921) (dissenting opinion) (citation omitted). In this vein, it should be

noted that the Department of Veterans Affairs and Congress have taken significant steps to alleviate the special problems of veterans as contrasted with those of civilians who worked alongside members of the armed forces. *See Agent Orange Act of 1991*, Pub.L. No. 102-4, 105 Stat. 11 (1991); 38 C.F.R. § 3.311a (1990) (Department of Veterans Affairs regulations establishing official "presumption" of connection between certain illnesses and military service in Vietnam); *In re "Agent Orange" Prod. Liab. Litig.*, 781 F.Supp. 902 (E.D.N.Y. 1991) (describing recent statutory and administrative developments). In any event, the possibility of a result more favorable to the civilian plaintiffs is present regardless of whether their action is heard in state or federal court. Equitable considerations, therefore, do not counsel against remand.

### III. APPEAL OF REMAND

██ 28 U.S.C. § 1447(d) was added in 1949 to the Judicial Code of 1948. As first enacted, it read: "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." In 1964, the provision was amended so as not to apply to civil rights suits. The statute now reads:

> An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1443 of this title shall be reviewable by appeal or otherwise.

Section 1447(d)'s prohibition applies whenever the district court remands for lack of subject matter jurisdiction under 28 U.S.C. § 1447(c). *See Thermtron Prods., Inc. v. Hermansdorfer*, 423 U.S. 336, 343, 96 S.Ct. 584, 589, 46 L.Ed.2d 542 (1976); *In re Pan American Corp.*, 950 F.2d 839, 842 (2d Cir.1991). If the district court remands for reasons not specified in section 1447(c), mandamus or other forms of appellate review may be appropriate. *Thermtron*, 423 U.S. at 351–53, 96 S.Ct. at 593–94 (mandamus proper where district court ordered

remand to ease crowded docket); *Karl Koch Erecting Co. v. New York Convention Cent. Dev. Corp.*, 838 F.2d 656, 658 (2d Cir.1988) (remand order based on forum selection clause reviewable because clause does not oust court of subject matter jurisdiction).

Since this case is to be remanded for lack of subject matter jurisdiction, review appears to be barred by a literal reading of 28 U.S.C. § 1447(d). This is an unfortunate result given the closeness of the case and the particular provision under which removal is sought. 28 U.S.C. § 1442, after all, is premised on the need for the federal courts to protect federal interests from possible state interference. In light of this concern, it would be useful for the parties and the district courts in this Circuit to have an authoritative pronouncement from the Court of Appeals, which has not yet had occasion to consider the "person acting under" provisions of section 1442(a)(1).

Recent case law from other circuits suggests that a path out of this quandary lies in 28 U.S.C. § 1292(b). In relevant part, that section provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action, may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order....

An early Tenth Circuit case held that section 1292, although passed subsequently to section 1447(d), was not intended to modify or supersede the latter. *See In re Bear River Drainage Dist.*, 267 F.2d 849 (10th Cir.1959); *accord Dawson v. Orkin Exterminating Co.*, 736 F.Supp. 1049 (D.Colo. 1990); J. Moore & B. Ringle, *1A Moore's*

*Federal Practice* ¶ 0.169[2.–1], at 688–90 (2d ed. 1991). More recent authority from the Third and Ninth Circuits maintains a contrary view, allowing review of orders of remand when the grounds for remand are certified for immediate appeal. *See In re TMI Litigation Cases Consolidated II,* 940 F.2d 832, 838–48 (3d Cir.1991) (review of remand for lack of subject matter jurisdiction appropriate where issue controlling remand is certified for appeal and order of remand is stayed pending outcome of appeal), *petition for cert. filed,* 60 U.S.L.W. 3344 (Oct. 23, 1991) (No. 91–676); *National Audubon Soc'y v. Department of Water,* 869 F.2d 1196, 1205 (9th Cir.1988) (same). The district and appellate court opinions in the *TMI* case are particularly useful for their detailed analysis of the interrelation of sections 1292 and 1447(d). *See In re TMI Litigation,* 940 F.2d at 838–48; *In re TMI Coordinated Proceedings,* 735 F.Supp. 640, 646–48 (M.D.Pa.1990), *vacated on other grounds,* 940 F.2d 832 (3d Cir. 1991).

 In the present case, there is a controlling question of law and a substantial ground for difference of opinion as to the appropriateness of defendants' attempt to remove under section 1442(a)(1). This question controls the extent of federal subject matter jurisdiction in this and like cases where important federal interests may be at stake. An immediate appeal might materially advance termination of the litigation by preventing remand and leaving the case in the present forum, where considerable materials are already in the record available for judicial notice. The court therefore certifies for immediate appeal the issue of section 1442(a)(1)'s availability for natural or legal persons providing goods and services to the government under conditions of the sort described in this case. "Certification is made recognizing that the first question for appellate resolution will be whether § 1292(b) review is available under these circumstances." *In re TMI Coordinated Proceedings,* 735 F.Supp. at 648.

## IV. CONCLUSION

The defendants have not met their burden of establishing that they were "person[s] acting under" federal officers within the meaning of section 1442(a)(1). No other basis for federal subject matter jurisdiction having been shown, the actions of Charles Brown and Clarence White are remanded to Texas state court. The court's order of remand is stayed pending completion of appeals.

So ordered.