**GURDA FARMS, INC., et al., Plaintiffs,**

v.

**MONROE COUNTY LEGAL ASSIS-TANCE CORP. et al., Defendants.**

**George GURDA, Sr., Plaintiff,**

v.

**Peter ALBERGHINI et al., Defendants.**

**George GURDA, Sr., Plaintiff,**

v.

**Peter ALBERGHINI et al., Defendants.**

**Nos. 72 Civ. 4489, 73 Civ. 67.**

United States District Court,
S. D. New York.

May 9, 1973.

Hofheimer, Gartlir, Gottlieb & Gross, New York City (Sylvia D. Garland, New York City, of counsel), for plaintiffs.

Levy, Gutman, Goldberg & Kaplan, New York City (Jeremiah S. Gutman, New York City, of counsel), and Bacharach, Green & Bass, White Plains, N. Y. (Stephen E. Bass, White Plains, N. Y., of counsel), for defendants.

BAUMAN, District Judge.

Both of the instant actions were first brought in the New York State Supreme Court, Orange County, and were removed to this court. Plaintiffs now petition for an order, pursuant to 28 U.S.C. § 1447(c), remanding the cases to the state court. Although the actions have not been formally consolidated, they arise from the same set of circumstances and both sides agree that they may be consolidated for the limited purpose of deciding this motion.

The underlying facts may be briefly stated. Plaintiffs are the owners and operators of farms located in Orange County which, in the summer of 1972, employed migrant farm workers, as had been done in years past. During this period defendant Monroe County Legal Assistance Corporation (hereinafter "MCLAC"), through its Mid-Hudson Valley Legal Services Project, attempted to render the migrants legal advice and other assistance pursuant to the mandate of 42 U.S.C. §§ 2861–2862.[1] That August, a number of MCLAC attorneys attempted to enter one of the farms and thereupon became engaged in an altercation with one or more members of the Gurda family; the precise facts of this encounter are very much in dispute.

These cases appear to arise both out of this incident and the overall activities of MCLAC. In 72 Civ. 4489 plaintiffs allege that the defendants were engaged in a conspiracy to induce the workers to breach their employment agreements and seek damages of $5,000,000 for loss of profits and damage to farm property. In 73 Civ. 67 George Gurda, Sr. sues MCLAC and several of its lawyers for civil assault, alleging damages of $250,000.

Defendants contend that removal to this court is proper pursuant to 28 U.S.C. § 1442(a)1,[2] which permits re-

---

1. 42 U.S.C. § 2861 provides:

"The purpose of this part is to assist migrant and seasonal farm-workers and their families to improve their living conditions and develop skills necessary for a productive and self-sufficient life in an increasingly complex and technological society."

42 U.S.C. § 2862 provides:

"(a) The Director may provide financial assistance to assist State and local agencies, private and nonprofit institutions and co-operatives in developing and carrying out programs to fulfill the purpose of this part.

(b) Programs assisted under this part may include projects or activities—

(1) to meet the immediate needs of migrant and seasonal farmworkers and their families, such as day care for children, education, health services, improved housing and sanitation (including the provision and maintenance of emergency and temporary housing and sanitation facilities), legal advice and representation, and consumer training and counseling;

(2) to promote increased community acceptance of migrant and seasonal farmworkers and their families; and

(3) to equip unskilled migrant and seasonal farmworkers and members of their families as appropriate through education and training to meet the changing demands in agricultural employment brought about by technological advancement and to take advantage of opportunities available to improve their well-being and self-sufficiency by gaining regular or permanent employment or by participating in available Government training programs."

2. 28 U.S.C. § 1442(a)1 provides:

"(a) A civil action or criminal prosecution commenced in a State Court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

moval of all suits against federal officers or persons acting under federal officers. The question presented then, is simple but novel, and apparently has not been previously considered by a United States District Court: are attorneys in an O. E. O. funded legal services program "persons acting under" a federal officer within the meaning of § 1442(a)1. The resolution of the question requires a brief survey of prior judicial treatment of this statute and of the rather complex structure of the O. E. O. legal services program.

■ The purpose of § 1442(a)1, whose ancestry is venerable, is to prevent federal officers or those acting at their direction from being held accountable in state courts for acts done within the scope of their federal duties. The Supreme Court, in Tennessee v. Davis, 100 U.S. 257, 25 L.Ed. 648 (1879), justified a predecessor of this statute [3] in the following manner:

"It [the federal government] can act only through its officers and agents and they must act within the states. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a state court, for any alleged offense against the laws of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection, if their protection must be left to the action of the state court, the operations of the general government may at any time be arrested at the will of one of its members." 100 U.S. at 263.

Time has not eroded the vitality of that holding. In Willingham v. Morgan, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), a suit by an inmate of Leavenworth Penitentiary against the warden and chief medical officer for personal injuries incurred through alleged medical experimentation, the Court held removal proper. It noted that the removal statute is an incident of federal supremacy, and one of its purposes was to provide a federal forum for cases in which federal officials raised defenses arising from their official duties. The Court observed that the statute is "not narrow or limited": "[a]t the very least it is broad enough to cover all cases where federal officers can raise colorable defenses arising out of their duty to enforce federal law." It went on to say that the congressional policy of giving federal officers the protection of a federal forum "should not be frustrated by a narrow, grudging interpretation of § 1442(a)1." See also, Colorado v. Symes, 286 U.S. 510, 52 S.Ct. 635, 76 L.Ed. 1253 (1932); Maryland v. Soper, 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449 (1926); Poss v. Lieberman, 299 F.2d 358 (2d Cir. 1962).

Even a cursory survey of the application of the statute reveals it has been construed broadly, and its "persons acting under" provision particularly so. A few examples should suffice. In State of Texas v. Heaton, 58 F.2d 656 (N.D. Texas 1932), the court upheld the removal of a murder prosecution against federal prohibition agents and an informer working for them. In People of the State of Colorado v. Maxwell, 125 F.Supp. 18 (D.Colo.1954), a murder prosecution against a city police chief who, under the direction of an Air Force captain, arrested (and then shot) a soldier was held properly removed. Teague v. Grand River Dam Authority, 279 F. Supp. 703 (N.D.Okla.1968), was a wrongful death action alleging negligent operation of the floodgates of a dam operated by the defendant under a fifty year license from the Federal Power Commission. The court found that this operation had been ordered by a federal officer, a member of the Army Corps of Engineers, and accomplished by the defendant as a "person acting under" such officer. In State of Texas ex rel. Faulkner v. National Bank of Commerce, 290 F.2d 229 (5th Cir.), cert. denied, 368 U.

3. Revised Statutes § 643.

S. 832, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961), a *quo warranto* proceeding against banks operating branch offices on military bases was held removable. The Fifth Circuit, in reaching this result, noted that those banking facilities were under the direction of the Secretary of the Treasury and were operated as agents of the federal government. The banks could perform only those functions enumerated in the letter granting them authority to act, and their facilities could be terminated or expanded as the Treasury Department dictated. See also, First National Bank of Bellevue v. Bank of Bellevue, 341 F.Supp. 960 (D. Neb.1972); Hazen v. Southern Hills National Bank of Tulsa, 414 F.2d 778 (10th Cir. 1969).

Two other cases demonstrate with particular force the broad sweep of the "persons acting under" clause. Kuenstler v. Occidental Life Insurance Company, 292 F.Supp. 532 (C.D.Cal.1968), upheld the removal of an action for $72 from the Small Claims Court against a private insurance company which had contracted with the federal government to administer benefit provisions of Medicare. Allen v. Allen, 291 F.Supp. 312 (S.D.Iowa 1968), sustained the removal of a garnishment action against a doctor who treated patients under Medicare. The court held that the defendant had been acting under the direction of the Secretary of Health, Education, and Welfare, and reasoned that "[s]ound policy requires the availability of a federal forum for adjudication of the legal status of persons who colorably have been acting under federal direction." See also Bates v. Carlow, 430 F.2d 1331 (10th Cir. 1970).

State of Oregon v. Cameron, 290 F. Supp. 36 (D.Or.1968), is particularly instructive. There the district court upheld the removal of a criminal trespass action against VISTA volunteers who entered upon farm property at the request of migrant farm workers to render medical assistance. It held that the VISTA workers were persons acting under an officer of the United States, here, the Director of O. E. O., and noted that the Director had authority to recruit, select, and train persons to serve in such programs pursuant to 42 U.S.C. § 2992. The court found that the VISTA workers performed work contemplated by a federal statute (42 U.S.C. § 2991) and were responsible to the Director of O. E. O. Furthermore, "the chain of command is clear": the workers were subject to the control of the VISTA Program Officer in Oregon who is designated by the VISTA Regional Administrator for the O. E. O. Western Region. The opinion also regarded as irrelevant the provision of 42 U.S.C. § 2994b that VISTA workers were not to be considered federal employees; one could come within the ambit of the "acting under" clause without being a federal employee. This opinion was cited with approval in Appalachian Volunteers Inc. v. Clark, 432 F.2d 530 (6th Cir. 1970).

These cases articulate no precise standard for the extent of control necessary to bring an individual with the "acting under" clause. The number and complexity of federal institutions and programs would render impossible the formulation of such a standard. What it comes down to is that the court in each case must ascertain to what extent defendants act under federal direction and to what extent as independent agents. It becomes necessary, then, to consider in some detail the relationship between legal service programs and the Office of Economic Opportunity.

The statutory authorization for MCLAC is twofold. Under 42 U.S.C. § 2809(a)(3) the Director of O. E. O. is authorized to develop legal service programs and under 42 U.S.C. § 2862(b)(1) (set out at footnote 1, supra), he can provide assistance to, inter alia, legal service programs which serve the needs of migrant farm workers. These statutes, however, are but the tip of an iceberg of exceedingly complex regulations, guidelines, and evaluation schemes to which MCLAC and all other O. E. O. legal assistance programs are subjected.

The affidavits and documentary evidence submitted by the defendants in opposition to the motion demonstrate convincingly the truth of a statement by defense counsel, a former legal aid lawyer himself: "Defendant corporation [MCLAC] is hedged in on all sides by voluminous O. E. O. directives under which it must operate on a day to day basis."[4] The strongest evidence of O. E. O. control over MCLAC policies and activities is supplied in the affidavit of Joan O'Byrne, executive director of MCLAC. It recites that all funds received by MCLAC derive from federal grants [Nos. 20053 and 0730]; as a condition of the receipt of these grants, the corporation must comply with a multitude of O. E. O. regulations, only a few of which will be hereafter set forth. Every three months it must submit a "Grantee Quarterly Financial Report" [O. E. O. Form 315], and within ninety days of the close of the fiscal year it must submit to an audit by a firm approved by O. E. O. This audit is then submitted to the Director of O. E. O.[5] In addition, the corporation can be subjected to a "spot audit" conducted by the Audit Division of O. E. O.; a few of these are conducted annually at legal service programs in various parts of the country.[6]

MCLAC must obtain waivers from both the regional and Washington offices of O. E. O. in order to pay a salary in excess of $15,000 per year. It must obtain similar waivers, from both offices, to raise any employee's salary by 20% or more. It must submit to O. E. O. the names and positions of all officers and employees receiving an annual salary in excess of $10,000. It is prohibited from representing clients in criminal actions. Its employees are subject to the restrictions and prohibitions of the Hatch Act.

The iron fist in the velvet glove of O. E. O. control over its legal services programs, however, is the program evaluation. Each year, as a condition precedent to the renewal of its funding, MCLAC must be "evaluated". Thereafter, O. E. O. can decide to reduce or withhold funding entirely; it can order personnel changes, restructure the Board of Directors, or require fundamental changes in programs and policies. The results of such evaluations are not infrequently acrimonious. The bloody aftermath of one evaluation is memorialized in Monmouth Legal Services v. Carlucci, 330 F.Supp. 985 (D.N.J.1971). There, O. E. O., after an evaluation, decided to terminate the plaintiff legal services organization and to merge it into another

---

4. Affidavit of Stephen E. Bass, p. 3.

5. These requirements are embodied in "Special Condition #5", appended to both of the aforementioned grants. In full, the condition reads as follows:
   "OEO REPORTING REQUIREMENTS
   1. By the twentieth day of the month following the end of each program year grantees submit two (2) copies of OEO Forms 315 and 315a to the Regional Office, (Attention: PM&S Division/Finance and Grants Management Branch) in accordance with OEO Instruction 6807-2, (Grantee Quarterly Financial Reports), dated December 20, 1971.
   2. Within ninety days (90) after the end of the grantee's Program Year submit an audit report prepared in accordance with OEO Instructions 6801-1, dated August 5, 1970, changes 1 and 2, dated May 11, 1971 and August 31, 1971 respectively, and Regional Instruction BR1-6801-1, change 1, dated March 15, 1972, (Grantee Fiscal Responsibility and Auditing).
   3. By the twentieth day after the end of the sixth month of the grantee's current Program Year, submit one (1) copy of OEO Form 315d, (Administrative Cost Report) in accordance with OEO Instruction 6807-1, dated December 20, 1971.
   Failure to submit the above reports on a timely basis or submission of erroneous information in them may be grounds for suspension of OEO financial assistance under this grant."

6. See letter of Theodore R. Tetzlaff, Acting Director of Office of Legal Services, of October 25, 1972, attached to O'Byrne affidavit as Exhibit C.

in a neighboring county. The plaintiff brought suit to enjoin this merger and to maintain its independence; it alleged, in essence, that it received a poor evaluation because its views of the proper role of legal services did not accord with the more activist views of its evaluators. Judge Lacey expressed sympathy with the plaintiff but concluded that there had not been a sufficient showing of administrative arbitrariness to justify the granting of a preliminary injunction.

A closer look at the program evaluation is therefore appropriate. The basic text here is the Office of Legal Services Evaluation Handbook, appended to the affidavit of P. Vaughn Gearan, the Regional Director of the Division of Legal Services. No precis can capture the flavor of this remarkable compendium, and the curious are referred to the original if they find the following treatment somehow unjust. The group conducting the evaluation consists of a "team captain", "team attorneys", and, if desirable, "community team members." (Each team member is exhorted at the very outset to proffer all suggestions that "will strengthen the team's performance in the field.") Athletic metaphors aside, the evaluators are required to interview the following people during the course of their survey, in addition to the staff and the board of directors of the program itself: the Model Cities staff director; the supervisor of the local welfare department and at least one case worker; the local bar association president; the local housing authority; two judges before whom staff lawyers have appeared; at least two private practitioners (including those favoring the program and those opposed); a law school dean; the clerk of at least one local court; and at least one elected member of local government.

Each evaluator must thereafter submit a report, which must include, inter alia, a detailed description of the setting in which the program operates; the structure of the program; the budget history of the program over the past three years; and the current allocation of financial resources. There must also be included an assessment of the major strengths and weaknesses, and suggestions for improvement. In addition, each staff attorney in the program evaluated must be given numerical ratings on such topics as "empathy with community served"; "interaction with community served"; and "commitment to OLS [Office of Legal Services] goals." An overall rating of the attorney's effectiveness must also be rendered, ranging from 1 ("hopelessly ineffective") to 5 ("clearly superior"). (The latter rating, it should be noted, carries with it the highest possible accolade: eligibility to act as a program evaluator.)

Lest the above techniques appear insufficiently thorough, there is a further check. Each evaluator must also submit a "Team Member Performance Evaluation", in which he must grade his teammates in such categories as "promptness", "initiative", "responsiveness to team captain's directions", and "cooperation with other team members."

One further point should be made regarding the extent of O. E. O. control. A "special condition" attached to MCLAC's grants, set out more fully in the margin,[7] acknowledges the possibili-

---

7. "Special Condition # 4" provides, in pertinent part:

"FISCAL LIMITATIONS ON OEO FUNDING

It is possible that Congress will approve legislation requiring that some OEO programs be funded in this fiscal year at levels not in accord with current plans. If such legislation is enacted affecting the appropriation under which this grant action is made, some adjustments in the funding of OEO programs might prove to be necessary. Accordingly, OEO reserves the right to revise this grant action in any manner which OEO may deem appropriate in order to take account of legislative and other limitations affecting OEO programs and funding. OEO may reduce the amount of this grant as a whole or as to any program account or accounts, may limit the rate of the grantee's authority to commit and spend funds, and may re-

ty of reductions in congressional funding of O. E. O. In such eventuality, O. E. O. reserves the right to revise the grant "in any manner which O. E. O. may deem appropriate." It can therefore reduce the grant as a whole, or reduce grants only for specified programs or accounts, and may make these determinations without prior consultation with the staff of the program so affected.

In light of the foregoing description of the relationship between O. E. O. and its legal service programs, I conclude that the defendants in the instant actions are persons "acting under" a federal officer within the meaning of § 1442(a)1. The federal officer in question is the Director of O. E. O., acting through his agents, the Director of the Office of Legal Services, and the Regional Director of that Office. O. E. O. lawyers are subject to the direction of the O. E. O. director at least to the same degree that the banks were subject to the Secretary of the Treasury in Texas ex rel. Faulkner v. National Bank of Commerce, supra, or the doctors subject to the Secretary of Health, Education and Welfare in Allen v. Allen, supra. It is clear that the activities of MCLAC, like all legal services programs, are carefully monitored by O. E. O., and that the independence of its lawyers is severely circumscribed. The lawyers are accountable to O. E. O. and respond to pol-

icies set by O. E. O.; furthermore, the very project in question here, the Mid-Hudson Valley Legal Services Project, is the product of a specific congressional authorization of legal assistance to migrant farm workers. 42 U.S.C. § 2862. I am moreover, persuaded by the reasoning of State of Oregon v. Cameron, supra, and do not believe that the difference between VISTA workers and poverty lawyers is sufficiently meaningful to distinguish this case.

The second requirement for removal under § 1442(a)1 is that the removal action be "for any act under color of such office." Plaintiffs nowhere contend that defendants were not acting under the color of their office, and therefore extended discussion is unnecessary. This case adequately meets the standard of Maryland v. Soper, supra, that there be a "causal connection between what the officer has done under asserted official authority and the state prosecution." 270 U.S. at 33, 46 S.Ct. at 190. See also Willingham v. Morgan, supra, at 406–407, 89 S.Ct. 1813.

I therefore hold that both of the instant actions were properly removed under 28 U.S.C. § 1442(a)1. The motions of plaintiffs to remand to the Supreme Court, Orange County, are hereby denied.

It is so ordered.

strict the grantee's use of both its unobligated and unspent funds.

It is OEO's intention to make any such changes on the basis of generally applicable principles. However, fiscal limitations may affect one class of programs more than others; programs having different time schedules may be affected differently; relative priorities may be established taking account of various factors that cannot be fully and specifically anticipated. OEO therefore reserves the right to make determinations on the basis of such variables without prior consultation with the grantee.

In accepting this grant, the grantee acknowledges OEO's authority to make such revisions in the grant program or budget."