Donald VIRDEN, on behalf of himself and others similarly situated, Plaintiff,

v.

ALTRIA GROUP, INC. and PHILIP MORRIS USA, Defendants.

No. CIV.A.5:03 CV 61.

United States District Court, N.D. West Virginia.

Jan. 30, 2004.

---

834

Mark T. Coulter, Peirce, Raimond, Osterhout, Wade, Carlson & Coulter, PC, D. Aaron Rihn, Peirce, Raimond, Osterhout, Pittsburgh, PA, for plaintiff.

Brian A. Glasser, Bailey & Glasser, LLP, David B. Thomas, Rebecca A. Betts, Philip J. Combs, Allen, Guthrie, McHugh & Thomas, PLLC, Charleston, WV, Ezra D. Rosenberg, Dechert LLP, Princeton, NJ, for defendants.

## MEMORANDUM OPINION AND ORDER OF REMAND

KEELEY, Chief Judge.

### I.

### PROCEDURAL BACKGROUND

On March 28, 2003, plaintiff Donald Virden ("Virden") filed this action in the Circuit Court of Hancock County, West Virginia, seeking relief on behalf of himself and "all others similarly situated." The first defendant to be served in the state court action received its copy of the complaint on April 3, 2003. Both defendants then removed this action to this Court on May 2, 2003. On June 3, 2003, Virden filed a motion to remand this action to state court. The Court has heard oral argument and, for the reasons that follow, **GRANTS** Virden's motion to remand.

### II.

### FACTUAL BACKGROUND

This is a purported consumer fraud class action allegedly arising under the West Virginia Consumer Credit and Protection Act, W. Va.Code § 46A–6–101 *et seq.* ("WVCCPA") and under the common law doctrine of unjust enrichment. Virden is a resident of New Cumberland, West Virginia. He alleges that he purchased and consumed on average approximately two and a half packs of Marlboro Lights cigarettes per day for approximately twenty years, and is seeking damages on behalf of himself and others similarly situated.

Defendant Altria Group, Inc. ("Altria") and its wholly owned subsidiary, Phillip Morris USA ("PM"), are Virginia corporations whose principal places of business are in New York City. During all times

relevant to this action, these defendants manufactured, promoted, marketed, distributed and sold Marlboro Lights brand cigarettes in interstate commerce and in West Virginia.

Virden alleges that the defendants deceived purchasers of Marlboro Lights by: (a) falsely or deceptively claiming that Marlboro Lights had lower tar and nicotine content than regular cigarettes; (b) failing to disclose the fact that measurements purporting to reflect reduced tar and nicotine levels were not the product of "benign changes" in tar and nicotine levels but were based on changes in cigarette design and composition; (c) failing to disclose that defendants "intentionally manipulated the design and content of Marlboro Lights in order to maximize nicotine delivery while falsely and/or deceptively claiming lowered tar and nicotine;" (d) failing to disclose that defendants engineered their cigarettes to "fool the machine tests that Defendants use as a basis to market their cigarettes as 'lights';" and (e) failing to disclose that the techniques employed by defendants to purportedly reduce the levels of tar "actually increase the harmful biological effects ... caused by the tar ingested to the consumer."

The defendants assert that federal jurisdiction exists based on one or more of the following grounds: (1) federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441; (2) federal officer jurisdiction under 28 U.S.C. § 1442(a)(1); and (3) diversity jurisdiction under 28 U.S.C. §§ 1332 and 1441.

### III.

### LEGAL STANDARD FOR MOTION TO REMAND

■ "Typically, an action initiated in a state court can be removed to federal court only if it might have been brought in federal court originally." *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338

F.3d 366, 370 (4th Cir.2003). Courts construe removal statutes narrowly. *Schlumberger Indus., Inc. v. Nat'l Sur. Corp.*, 36 F.3d 1274, 1284 (4th Cir.1994). The party seeking removal bears the burden of showing that the district court has original jurisdiction. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). "[C]ourts should resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 425 (4th Cir.1999).

### IV.

### SUBSTANTIAL FEDERAL QUESTION JURISDICTION

The defendants claim that removal is appropriate because Virden's claims arise under federal law. Title 28, United States Code, Section 1331, provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

■ To determine whether federal question jurisdiction exists, a court looks first to the well-pleaded complaint rule. That rule provides that, ordinarily, the court has "arising under" jurisdiction only if the plaintiff's well-pleaded complaint raises an issue of federal law. *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 10–11, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The rule allows the plaintiff to be the "master of the claim" and "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

■ An exception to the well-pleaded complaint rule arises when the plaintiff's complaint raises a substantial question of federal law, regardless of the manner in which the plaintiff has pled his or her

claim. *See Mulcahey,* 29 F.3d at 151. Although state law creates a plaintiff's cause of action, federal question jurisdiction may nonetheless attach if "plaintiff's demand necessarily depends on resolution of a *substantial* question of federal law." *Id.* (citing *Franchise Tax Bd.,* 463 U.S. at 28, 103 S.Ct. 2841) (emphasis in original).

■ Federal jurisdiction is not justified merely because the state court *may* be required to resolve questions of federal law: "[F]ederal law must be in the forefront of the case and not collateral, peripheral or remote." *Id.* at 152. For federal law to be at the "forefront" of the case, "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Franchise Tax Bd.,* 463 U.S. at 11, 103 S.Ct. 2841 (citing *Gully v. First Nat'l Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936)).

■ The defendants contend that Virden's claims have been artfully pled to avoid federal jurisdiction despite the fact that the real nature of his claims is federal. Under the artful pleading doctrine invoked by the defendants, the removal court must "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398 n. 2, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

■ Despite its availability, the artful pleading doctrine must be applied with circumspection. "An expansive application of the doctrine could effectively abrogate the rule that a plaintiff is master of his or her complaint." *Semtek Int'l, Inc. v. Lockheed Martin Corp.,* 988 F.Supp. 913, 916 (D.Md.1997) (quoting *United Jersey Banks v. Parell,* 783 F.2d 360, 368 (3d Cir.1986)).

The defendants assert that Virden's complaint necessarily requires the resolution of a substantial question of federal law, which is the validity of the federal regulatory regimen governing the testing and labeling of "light" cigarettes. To evaluate this claim, the Court must first determine the nature of the regulatory regimen in place and whether Virden's complaint will require a decision that would interfere with that regimen.

### A.

### *BRIEF REVIEW OF FEDERAL REGULATION OF "LIGHT" CIGARETTES*

The Federal Trade Commission ("FTC") first became involved in the regulation of tar and nicotine claims by cigarette companies in the mid–1950s. In September 1955, it published cigarette advertising guides which, among other things, informed the tobacco companies that they could make representations regarding tar and nicotine levels only if they had "established by competent scientific proof at the time of dissemination that the claim is true." Cigarette Advertising Guides, Trade Reg. Rptr. ¶ 39,012 at 41,-602 (Sept. 22, 1955) (CCH 1955). The FTC grew dissatisfied with this regimen, however, when disparate testing methods led to consumer confusion. Thus, in 1959, it directed the tobacco companies to stop advertising that their cigarettes had "low or reduced tar." Letter from W.H. Brain to A. Yeaman (Dec. 17, 1959).

In the mid–1960s, the FTC sought to establish a system that would allow the cigarette industry to inform consumers of tar and nicotine levels and also ensure that the disclosed figures were standardized across brands. In a March 25, 1966 letter sent by the agency to each of the nation's major cigarette manufacturers, the FTC stated that "a factual statement of the tar and nicotine content" would not violate federal trade laws "so long as (1) no collateral representations ... are made, expressly or by implication, as to the reduc-

tion or elimination of health hazards, and (2) the statement of tar and nicotine content is supported by adequate records of tests conducted in accordance with the Cambridge Filter Method ...." FTC News Release (Mar. 25.1966).

In 1967, the FTC began testing cigarettes at its own laboratory, using a modified version of the Cambridge Filter Method (otherwise known as the "FTC Method"). Significantly, when it adopted the modified Cambridge Filter or "FTC Method", the FTC noted that this method was not necessarily "better" than other methods, but rather that it served the public interest to implement a uniform cigarette testing method at a centralized, neutral laboratory. FTC Press Release, "FTC To Begin Cigarette Testing" (Aug. 1, 1967). The FTC further noted that, because "[n]o two human smokers smoke in the same way," the "FTC Method" was not an attempt "to gauge the test to the amount of smoke, or tar and nicotine, which the 'average' smoker will draw from any particular cigarette." *Id.* The goal was standardization.

Following adoption of the "FTC Method", in 1970 the FTC proposed formal rulemaking to require tobacco companies to disclose tar and nicotine ratings in advertising. Confronted with the prospect of regulation, the major cigarette companies opted to voluntarily adopt a disclosure program under which, for each variety of cigarettes, they agreed to disclose clearly and prominently the values for "tar ... and nicotine ... contained in the [FTC] published test results, under its present methodology, in all advertising distributed in the United States ..." Letter from J. Martin, Jr. FTC (Dec. 14, 1970).

The FTC accepted this voluntary agreement and indefinitely suspended its rulemaking effort. It continued to maintain its testing lab, however, in order to ensure the integrity of the testing procedures.

After it finally closed its lab in 1987, it directed the tobacco companies to assume responsibility for testing, subject to FTC review.

Although the FTC never promulgated rules requiring the tobacco companies to disclose in their advertising the results yielded under the FTC Method, it did continue to regulate misleading advertising of tar and nicotine levels. In 1971, for example, it challenged as deceptive particular ads of American Brands, Inc. that referred to "U.S. Government figures" as authority for the company's "low tar" claim, and that also made misleading comparisons. Contrary to the implication in the company's ads, the FTC noted that American Brands' cigarettes were ranked roughly in the middle among cigarette brands for tar levels as measured by the FTC Method. *See In re Am. Brands,* 79 F.T.C. 255 (1971). Seven years later, in 1978, the FTC notified Lorillard that it could not advertise tar numbers higher than those yielded under the FTC Method and label them " 'By FTC Method,' given that the figures would not actually be the result of the FTC Method." *In re Lorillard,* 92 F.T.C. 1035 (1978).

## B.

### *ANALYSIS*

To resolve Virden's claims, the defendants maintain that the Court will be required to evaluate the validity and sufficiency of the FTC's standards and that any evaluation of these standards must be determined as a matter of federal law. If the Court refuses to exercise jurisdiction over this action, the defendants fear they may be compelled to comply with fifty different state standards for the testing and disclosure of tar and nicotine levels in their cigarettes.

Virden argues that his claims are based solely on state law, and are an attack, not on the FTC Method, but on the defendants' deceptive engineering of their cigarettes. That deceptive engineering, he contends, permitted the defendants' cigarettes to register low tar and nicotine levels pursuant to the FTC method while simultaneously delivering high levels of tar and nicotine to human smokers.

The defendants rely on *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799 (4th Cir. 1996), and, more significantly, on *In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation*, 216 F.Supp.2d 474 (D.Md.2002), to support their contention that Virden's complaint requires the resolution of a federal question. Whatever the implications of these cases, as the following discussion discloses, they provide thin support for the proposition that the issue of the validity of the FTC's regulations raises a substantial question of federal law in this case.

*Ormet* involved a dispute between two private parties over the ownership of emission allowances issued by the Environmental Protection Agency ("EPA"). Title IV of the Clean Air Act authorized the EPA to issue permits that allowed the emission of polluting gases within prescribed limits, and also allowed permit holders to sell and transfer these emission allowances in a competitive market. *Ormet*, 98 F.3d at 801. Thus, if a permit holder devised a cost-effective method of reducing emissions below its prescribed allowance, it could capitalize on any surplus of its allowable emissions over its actual emissions by trading that surplus. *Id.* Under agency regulations, the EPA does not adjudicate disputes over the ownership of emission allowances. *Id.* at 804.

The litigants in *Ormet* were parties to a contract involving the share of emission allowances. *Id.* at 803. Although the contract had been privately formed, resolution of the dispute depended on whether the plaintiff was an "owner" of the emission allowance, which, in turn, depended on whether the contract was a "life-of-the-unit, firm power contractual arrangement" as defined in the Clean Air Act. *Id.* at 803; *see also* 42 U.S.C. §§ 402(27) and 408(i).

After careful review, the Fourth Circuit concluded that "the dispute require[d] the interpretation and application of the [Clean Air] Act to the contractual arrangement between the parties." *Id.* at 807. Although sale and transfer questions would be "resolved through application of standard principles of commercial law," ownership could not ultimately be determined without a finding as to who was entitled to share in the EPA's initial allocation of the emission allowances. *Id.* at 807. Thus, the resolution of the dispute required the interpretation of federal law: "Where the resolution of a federal issue in a state law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction in the federal courts." *Id.* (citing *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347–48, 4 L.Ed. 97 (1816)). Deciding that the stability and efficiency of the federally-created market in a federally-created commodity required uniformity, our circuit court concluded that the plaintiff's complaint raised a substantial question of federal law.

In *Wireless Telephone*, consumers sued various cellular telephone ("cell phone") companies, asserting a variety of state law claims based on the allegation that defendants "negligently and fraudulently endangered the consuming public by providing wireless phones without headsets, knowing that these phones emit unsafe levels of

radio frequency ('RF') radiation." 216 F.Supp.2d at 479.

To determine the federal nature of these claims, the district court had to analyze the statutory and regulatory scheme governing RF emissions from cellular telephones. In the Federal Communications Act of 1996, Pub.L. No. 104–104, 100 Stat. 56 (1996), § 704(b), Congress directed the Federal Communications Commission ("FCC") to set national standards regulating RF emissions. In response, the FCC promulgated safety regulations that "clearly and specifically delineate the levels of RF emissions that will be allowed from wireless phones." *Wireless Telephone*, 216 F.Supp.2d at 482; *see* 47 C.F.R. § 2.1093(d)(2). Because national uniformity was an overriding goal, Congress explicitly prohibited state and local governments concerned about RF radiation from regulating RF emissions. *Wireless Telephone*, 216 F.Supp.2d at 482 (citing 47 U.S.C. § 332(c)(7)(b)(iv)). After consulting numerous federal agencies, the FCC promulgated regulations governing the allowable level of RF emissions. *Id.*

The defendants' cell phones in *Wireless Telephone* complied with federal safety regulations governing RF radiation emissions. *Id.* at 482, 487. Nevertheless, the plaintiffs argued that the defendants could be held liable under state law because the defendants knew those regulations permitted unsafe RF emissions, and they continued to sell allegedly dangerous phones without warning consumers of the risks their phones posed. *Id.* at 487. Although the FCC had considered and rejected a headset requirement as part of its regulation of RF emissions, the plaintiffs sought a court order requiring the defendants to provide them with headsets. *Id.* at 489.

After considering all these facts, the district court concluded that the plaintiffs' claims had been artfully pled to avoid federal jurisdiction, and that federal jurisdiction was proper because resolution of the plaintiffs' claims was dependent on a substantial question of federal law: "[T]he central premise of each count of each complaint is that federal safety regulations governing wireless hand-held phones permit the sale of a product that is unreasonably dangerous to consumers." *Id.* at 491–93. Relying on *Ormet*, the court noted that "the current federal requirements reflect carefully considered judgments by Congress, FCC, FDA, EPA, NIOSH, and OSHA about the appropriate method of balancing these concerns." *Id.* at 490. Thus, despite the narrowness of the artful pleading exception, the court felt compelled to reach its conclusion that plaintiffs' suit, in effect, was a suit to invalidate a federal regulation. *Id.* at 491.

In the instant case, neither Congress nor the FTC requires disclosure of tar and nicotine levels; nor do they require that the levels, if disclosed, be disclosed in a particular manner. Virden, thus, cannot challenge the validity of a federal regulation or require an interpretation of a federal law.

The defendants argue that the FTC allows only the "FTC Method" to be used for tar and nicotine measurements and communications. Noticeably absent from their argument, however, is any reference to a statute or regulation requiring cigarette companies to disclose tar and nicotine levels at all, and to do so using the FTC Method. Thus, while the FTC has advocated the use of a specific method for measuring tar and nicotine levels during the period at issue, it has never identified that method as superior to other testing regimens, and has continued its search for a more reliable testing method.

In the seminal case of *FTC v. Brown and Williamson Tobacco Corp.*, 778 F.2d 35, 45 (D.C.Cir.1985), the United States Court of Appeals for the District of Colum-

bia Circuit squarely rejected the idea that tobacco companies are required to use the FTC Method to measure tar and nicotine levels. The district court had concluded that Brown & Williamson's ("B & W") claim that its Barclay cigarette is "1 mg. tar" was deceptive within the meaning of 15 U.S.C. § 45(a) and had "permanently enjoined [B & W] from promoting its Barclay cigarettes by advertising, package layout or other means with any claim to a specific milligram tar content rating, *unless such rating is approved by the FTC or derived using a test methodology approved by the FTC* for measuring Barclay." *FTC v. Brown & Williamson Tobacco Corp.*, 580 F.Supp. 981, 990 (D.D.C.1983) (emphasis added).

While the circuit court affirmed the district court's finding that B & W's advertising was deceptive, it reversed that portion of the injunction requiring B & W to obtain prior FTC approval of its advertising of tar and nicotine content. A unanimous panel concluded that this portion of the injunction could not stand because "that would enshrine the current FTC system as the sole legitimate testing method, even though it was not passed pursuant to section 18 of the FTC Act, 15 U.S.C. § 57(a) (1982), and not subjected to the possibility of judicial review." *Brown & Williamson*, 778 F.2d at 45. Accordingly, the circuit court remanded the case to the district court with instructions "to modify the in-

junction to allow for the presentation of the results of a different testing system, so long as any advertisement of such results contains sufficient data to avoid deceptiveness due to confusion with the FTC testing system." *Id.*

Throughout the period at issue in this case, the FTC advocated a specific method for measuring tar and nicotine levels; however, it never mandated that cigarette companies use the FTC method. This is because the FTC lacks the authority either to mandate the use of its method or to require prior approval of alternative methods of measuring tar and nicotine levels. *Id.* Currently, it regulates only deceptive advertising, and, as noted, has exercised this general authority by bringing actions against those tobacco manufacturers who have deceptively advertised their tar and nicotine content. *See, e.g., Lorillard*, 92 F.T.C. 1035 (1978).

Importantly, the FTC does not consider use of its "Method" to constitute a safe harbor for manufacturers. In *Brown & Williamson*, for example, the FTC challenged a cigarette company's tar figure as misleading despite the fact that the number advertised by the company had been determined using the FTC Method.[1]

Because the defendants have not identified any statute or regulation that requires them to disclose tar and nicotine content using the FTC Method, the *Ormet* and

---

1. In the recent case of *Watson v. Philip Morris Cos.*, No. 4:03–CV–519 GTE, slip op. at 28–29, 2003 WL 23272484 (E.D.Ark. Dec. 12, 2003), the district court relied on *Brown & Williamson* to conclude that the FTC regulates tar and nicotine testing and disclosure. While this Court agrees that the FTC is authorized to and engages in the regulation of deceptive advertising, it respectfully disagrees that the FTC had or did exercise the power to mandate testing and disclosure under the FTC Method. *See id.* at 29–30. The D.C. Circuit did not "free" Brown & Williamson to devise an alternative method. *See id.* at 29. Rather,

it observed that the district court had erred in believing that the FTC could restrict Brown & Williamson's testing and disclosure of tar and nicotine levels beyond limitation of deceptive advertising. *Brown & Williamson*, 778 F.2d at 45. In *Watson*, the district court found that the FTC Method remained a "safe harbor" under *Brown & Williamson*, Slip op. at 29–30. *Brown & Williamson*, however, arose because the FTC determined that Brown & Williamson's use of the FTC Method was deceptive. Thus, Brown & Williamson was subject to FTC action *despite* its use of the FTC Method.

*Wireless Telephone* cases are inapposite; there can be no concern here that a state law claim could "undermine the stability and efficiency of a federal statutory regime" because there is no evidence that such a regime, in fact, exists. *See Fair v. Sprint Payphone Svcs., Inc.*, 148 F.Supp.2d 622 (D.S.C.2001) (holding that no substantial federal question was raised when Congress gave the FCC the authority to regulate payphone services in correctional facilities, but the agency had not exercised that authority). Thus, Virden's complaint does not raise a substantial question of federal law.

## V.

### FEDERAL OFFICER REMOVAL JURISDICTION

Title 28, United States Code, Section 1442, provides a statutory exception to the well-pleaded complaint rule allowing "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" to remove an action by raising a "colorable federal defense" in his removal petition. *Jamison v. Wiley*, 14 F.3d 222, 239 (4th Cir.1994).

▮ To claim the protection of 28 U.S.C. § 1442(a) based on an assertion that a defendant acted at the direction of a federal officer, a defendant must first establish that it is a "person" under the removal statute. A defendant who is a "person" under the statute must further: "(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to plaintiffs' claims and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office." *Pack v. AC and S, Inc.*, 838 F.Supp. 1099, 1101 (D.Md.1993) (citing *Mesa v. Cal.*, 489 U.S. 121, 124–25, 129–31, 134–35, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)).

Virden proffers three arguments as to why the defendants' attempt to find shelter under the federal officer removal statute is unavailing. First, he maintains they should be judicially estopped from claiming they served as federal officers. Second, he asserts they are not "persons" under the removal statute. Finally, he contends they were not acting under the "direct and detailed control" of a federal officer with respect to the actions giving rise to his complaint. The Court will address each of these arguments seriatim.

### A.

#### Judicial Estoppel

According to Virden, the defendants are estopped from asserting that they are "federal officers" because they successfully argued in an earlier *Bivens* action that they were not federal officials, and also because one of their representatives stated in a letter that the defendants were not subject to regulation by the FTC.

▮ In the Fourth Circuit, the party seeking to have a court apply the doctrine of judicial estoppel must establish three elements: (1) The party sought to be estopped is seeking to adopt a position on an issue of fact (rather than law or legal theory) that is inconsistent with a stance taken in prior litigation; (2) the prior inconsistent position must have been accepted by the court; and (3) the party sought to be estopped must have intentionally misled the court to gain unfair advantage. *1000 Friends of Md. v. Browner*, 265 F.3d 216, 226–27 (4th Cir.2001).

▮ The first basis asserted by Virden, that the defendants previously claimed in a *Bivens* action they were not federal officers, does not support application of the judicial estoppel doctrine. To the extent the defendants are asserting a position here that is inconsistent with their earlier

position, it is an inconsistent position of law, not fact; because estoppel applies only to assertions of fact, their legal posture in the prior case is irrelevant. *Id.* at 226.

■ Virden's second basis for asserting judicial estoppel, that the defendants wrote a letter to the FTC stating they were not subject to FTC regulation, is also meritless. The defendants' statement was made in a letter; however, under *Browner* the judicial estoppel doctrine applies only to statements made in "prior litigation." *Id.*

## B.

### Status of Corporations as Persons

■ Virden next asserts that, because defendants are corporations they are not "persons" for purposes of the federal officer removal statute. In support of this contention, he cites *Krangel v. Crown*, 791 F.Supp. 1436, 1442 (S.D.Cal.1992) (holding that corporations are not "persons" under the federal officer removal statute). The majority of courts construing the removal statute, however, have disagreed with the holding in the *Krangel* case and have applied the federal officer removal statute to corporations. "Where rules are drafted by a legislative body familiar with traditional legal concepts, one can reasonably assume that the word 'person' is intended to indicate more than natural persons." *Pack*, 838 F.Supp. at 1102. Furthermore, courts adopting the majority position have found that including corporations within the definition of "persons" is consistent with the statutory goal of the federal officer removal statute to prevent state suits from inhibiting federal policy. *Id.* (citing *Ryan v. Dow Chem. Co.*, 781 F.Supp. 934, 946 (E.D.N.Y.1992)). The majority rule, both as a matter of statutory construction and policy, is persuasive, and the Court concludes that the defendant corporations are "persons" under 28 U.S.C. § 1442.

## C.

### Acting Under a Federal Officer or Regulatory Scheme

Virden's third argument, that the defendants cannot avail themselves of the federal officer removal statute because their actions were not performed pursuant to an officer's direct orders, or to comprehensive and detailed regulations, requires careful consideration. In other tobacco litigation, district courts confronted with the same question have disagreed as to the applicability of the federal officer removal statute. *Compare Watson v. Philip Morris Cos.*, No. 4:03–CV–519 GTE, 2003 WL 23272484 (E.D.Ark. Dec. 12, 2003) (holding that the court had federal officer removal jurisdiction), *with Pearson v. Philip Morris*, No. 03–CV–178–HA (D.Or. Aug. 8, 2003) (holding that the court did not have federal officer removal jurisdiction); and *Tremblay v. Philip Morris*, 231 F.Supp.2d 411 (D.N.H.2002) (same).

■ "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Ryan*, 781 F.Supp. at 947. "[T]he mere fact that a corporation participates in a regulated industry is insufficient to support removal absent a showing that the particular conduct being sued upon is closely linked to detailed and specific regulations." *Wireless Telephone*, 216 F.Supp.2d at 500 (holding that extensive federal regulation of the cell phone industry justified federal question jurisdiction but did not qualify cell phone companies as federal officers entitled to federal officer removal); *see also Little v. Purdue Pharma, L.P.*, 227 F.Supp.2d 838, 861 (S.D.Ohio 2002) (holding that extensive regulation of the pharmaceutical industry did not justify federal officer removal ju-

risdiction for pharmaceutical company). Nonetheless, the statute does not require that the person or entity invoking the federal officer removal jurisdiction statute actually be a federal officer; it clearly contemplates that a private actor can claim its protection when it is threatened with liability for actions taken on behalf of a federal officer.

The paradigm cases in which private actors have succeeded in removing cases under the statute have involved government contractors with limited discretion. *See Pack v. AC and S, Inc.*, 838 F.Supp. 1099, 1103 (D.Md.1993) (government construction contractor entitled to federal officer removal where the government maintained "control over the construction, design and testing of the turbines" and would "specify and approve the type of asbestos cloth to be used when insulating valves and flanges"); *Fung v. Abex Corp.*, 816 F.Supp. 569, 572–73 (N.D.Cal.1992) (government construction contractor entitled to federal officer removal where the government "monitored [defendant's] performance at all times," "required the defendant to construct and repair the vessels in accordance with the applicable and approved specifications incorporated into the contracts," and "all contract supplies were subject to inspection, test, and approval by the government"). Notably, in *Pack* and *Fung* the private actors were sued not only for performing services for the federal government but also because they performed them in the manner required by the federal government.

Similarly, courts have held that Medicare program contractors can be considered "federal officers" because they serve as agents of the federal government. *See Neurological Assocs. v. Blue Cross/Blue Shield of Fla., Inc.*, 632 F.Supp. 1078, 1080–81 (S.D.Fla.1986) (noting that defendant Blue Cross was being represented by Justice Department attorneys and that

contracting with private intermediaries "is simply the Government's mechanism to carry out the Medicare Act and the regulations."); *Kuenstler v. Occidental Life Ins. Co.*, 292 F.Supp. 532, 533 (C.D.Cal.1968) (concluding that defendant was "the duly authorized agent of the United States of America in administering the [program]" and that "[t]he United States of America [was] the real party in interest in [the] action.").

Finally, courts have applied the federal officer removal statute to private actors whose official functions are so intertwined with the federal government that they are effectively considered employees of the federal government. *See Gurda Farms v. Monroe County Legal Assistance Corp.*, 358 F.Supp. 841 (S.D.N.Y.1973); *Oregon v. Cameron*, 290 F.Supp. 36 (D.Or.1968). The defendants in *Cameron* were "volunteers" acting pursuant to their duties in the federal Volunteers in Service to America ("VISTA") program. *Id.* at 37. Although the defendants were nominally volunteers, they were "paid by the United States," they performed work "contemplated by [a] federal statute," they were hired and trained by a federal officer, and, through a clear "chain of command," were responsible to a federal officer. *Id.* Similarly, in *Gurda*, the court noted several reasons supporting its conclusion that legal aid lawyers qualified for federal officer removal status: First, their funding came solely from federal funds; second, they were regularly evaluated for possible increases, decreases, or total withdrawals of funding; and, third, their independence was "severely circumscribed." 358 F.Supp. at 845–47.

█ In *Bakalis v. Crossland Savings Bank*, 781 F.Supp. 140, 145 (E.D.N.Y. 1991), the district court surveyed the case law and concluded that a corporation attempting to avail itself of federal officer

removal jurisdiction must show that it was subject to "regulation plus." As the court defined that term, the defendants, through their conduct giving rise to liability, would have to be so "intimately involved with government functions as to occupy essentially the position of an employee . . . ." *Id.* This standard reliably summarizes the relevant case law. It does not matter whether the federal government deputizes a private individual or entity through a contract or by creating a private program to further a government interest. If the actor is effectively an agent or employee of the government because its activities are controlled and funded by the government, it is entitled to the same jurisdictional protection as the government itself.

◼ In the case at bar, the defendants have never acted as agents or employees of the federal government. Since 1970, their use of the FTC Method and disclosure of tar and nicotine content in "light" cigarettes has been governed by a voluntary private agreement. Although the FTC has controlled how its method is administered, the gravamen of Virden's complaint is that the defendants exploited weaknesses in the FTC Method so that their cigarettes registered artificially low tar and nicotine levels, and disseminated this information to mislead consumers. Even if the defendants' alleged wrongdoing is based in part on their exploitation of weaknesses in a testing method endorsed by the FTC, the FTC did not mandate the use of this testing method, did not direct them to "trick" the testing procedure, and did not require them to disseminate misleading information.

The indicia of federal control present in cases finding federal officer removal jurisdiction are wholly lacking here. The tobacco industry funds all testing under a voluntary program and there is no evidence that the United States will be held responsible if Virden prevails. To the extent that the FTC's acceptance of a voluntary agreement formed in 1970 by the tobacco industry may suggest its implied regulation of the defendants, that is not the type of "regulation plus" that would justify federal officer removal jurisdiction.

Under the facts in this case, the most that can be said is that the FTC has been impliedly regulating the tobacco industry through its tacit acceptance of a voluntary private agreement made thirty years ago. As already noted, however, it never mandated the use of the FTC Method; indeed, it lacks the power to do so. Moreover, the FTC never required the defendants to manufacture their cigarettes in the manner giving rise to the plaintiff's complaint. Accordingly, it did not exercise the requisite direct and detailed control over the defendants that is necessary to justify federal officer removal jurisdiction.

The Court is aware that, in contrast to the ruling here, the district court in *Watson v. Philip Morris Cos.*, No. 4:03–CV–519 GTE, 2003 WL 23272484 (E.D.Ark. Dec. 12, 2003), recently held that the "regulation plus" standard had been met. Although the FTC had not formally mandated that cigarette companies participate in testing and disclosure using the FTC Method, *Watson* found the agency's involvement was sufficiently significant to effectively "compel[___] adherence" by the tobacco companies, and this compulsion served as a basis for the tobacco companies to remove the state law action under the federal officer removal statute. Slip. op. at 30.

On some level the FTC clearly has coercive control over the tobacco companies' tar and nicotine advertising based on its power to regulate deceptive advertising. However, in this Court's opinion, neither the right to control, nor the threat of taking control, constitutes the direct and

detailed control required for the application of federal officer removal jurisdiction.

## VI.

### DIVERSITY JURISDICTION

 A district court has jurisdiction over a suit between citizens of different states when the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. A defendant seeking removal must prove the jurisdictional amount by a preponderance of the evidence. *McCoy v. Erie Ins. Co.*, 147 F.Supp.2d 481, 488–89 (S.D.W.Va.2001). In the Fourth Circuit, removal statutes are strictly construed *against* removal. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir.1994).

 "[W]hen several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and ... those amounts cannot be added together to satisfy jurisdictional requirements." *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 589, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). This rule applies to class actions. The claims of class plaintiffs cannot be aggregated for purposes of meeting the minimum jurisdictional amount. *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 296, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973)(citing *Steele v. Guar. Trust Co. of New York*, 164 F.2d 387, 388 (2d Cir. 1947)). Although the individual claims of a class of plaintiffs are not "aggregated," the Fourth Circuit has interpreted the supplemental jurisdiction statute to provide federal jurisdiction over the claims of all plaintiffs if a defendant can establish that the court has jurisdiction over the claims of any named plaintiff. *Rosmer v. Pfizer Inc.*, 263 F.3d 110, 114 (4th Cir.2001) (interpreting 28 U.S.C. § 1367).

 The general principle of non-aggregation is subject to the "common fund" exception. If the claims underlying the class action are "separate and distinct," the relevant "amount in controversy" is based upon each plaintiff's claims and not upon the aggregate. *Glover v. Johns–Manville Corp.*, 662 F.2d 225, 231 (4th Cir.1981) (citations omitted). Under the common fund exception, however, "[a]ggregation is permitted ... where 'two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest.'" *Id.* (quoting *Snyder v. Harris*, 394 U.S. 332, 335, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)).

 In the case at bar, Virden limited the damages in his *ad damnum* clause to $75,000. In general, courts treat the amount requested by the plaintiff in the state court as the amount in controversy. 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3725 (3d ed.1998). This rule can be problematic, however, in states, such as West Virginia, where recovery in the courtroom is not limited to the amount demanded in the complaint. *Id.* "In West Virginia, a plaintiff is not bound by the *ad damnum* clause and may seek to amend it after final judgment to conform to the evidence." *Hicks v. Herbert*, 122 F.Supp.2d 699, 701 (S.D.W.Va.2000). Therefore, absent a binding stipulation signed by Virden that he will neither seek nor accept damages in excess of $75,000, the Court must independently assess whether the defendants have proven by a preponderance of the evidence that Virden's complaint seeks damages in excess of $75,000.

#### A.

##### Actual Damages

Virden seeks actual damages (or the $200 provided as statutory damages),

which would be the amount he spent to purchase packs of Marlboro Lights. The actual damages of each prospective class member, likewise, would consist of the amount that each spent purchasing Marlboro Lights during the class period. Because the relief sought is distinct for each class member, the general rule of disaggregation applies.

Virden's complaint avers that he purchased and consumed two and a half packs of Marlboro Lights per day for twenty years. At the hearing on the motion to remand, his attorney first estimated his client's actual damages at $10,000 to $15,000. When questioned about the source of his numbers, however, he stated that he had not done the "hard math" but estimated an average price of two dollars per pack. In conducting this last minute calculation, he mistakenly stated that Virden had smoked one pack per day. Defense counsel immediately clarified that Virden actually smoked two and a half packs per day, but willingly adopted Virden's two dollar per pack estimate about the average price of Marlboro Lights sold in West Virginia during the period at issue. Thus, the plaintiff's two dollar figure is the only one available to the Court. Employing that figure, Virden's actual damages are approximately $36,500 (2½ packs per day × $2.00 per pack for 20 years).

## B.

### Disgorgement

On behalf of the proposed class, Virden seeks either a refund of all monies he and the class members expended *or* that "Defendants disgorge all profits which they made on account of any Marlboro Lights manufactured, distributed or sold by them which were purchased in West Virginia during the Class Period by the Plaintiff or the Class...." (Compl.¶ 8.) The defendants contend that Virden's request for disgorgement of profits is a claim to enforce a single title or right in which Virden and the class members have a common and undivided interest. For purposes of determining the jurisdictional amount, they therefore maintain that the Court should aggregate the claims of all class members and treat Virden's disgorgement claim as one for recovery of a common fund.

Virden disputes this characterization, asserting that the disgorgement remedy is an equitable alternative to his request for actual damages. Thus, like his claim for actual damages, it is based on the "separate and distinct" interests of each class member.

The defendants cite four cases in support of their common fund theory. *See Durant v. Servicemaster Co.,* 147 F.Supp.2d 744 (E.D.Mich.2001); *In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 702, 720–21 (D.Md.2001); *In re Cardizem CD Antitrust Litig.,* 90 F.Supp.2d 819, 826 (E.D.Mich.1999); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft,* 48 F.Supp.2d 37, 41 (D.D.C.1999). These cases, however, do not establish a *per se* rule that class action claims for disgorgement must be aggregated. Rather, they stand for the proposition that courts should determine the issue in each case based on a close analysis of the complaint.

The four cases all involved disgorgement claims that did not depend on the individual plaintiffs' actual damages. In *In re Microsoft,* for example, the court aggregated the disgorgement claims because plaintiffs sought that remedy *in addition* to actual damages. Therefore, the court construed the complaint as seeking all of the defendant's wrongfully obtained profits, not only those attributable to sales made to the class members. 127 F.Supp.2d at 720–21.

In the other three cases, the courts determined that the plaintiffs had articulated

a claim to a common fund for two reasons. First, their respective complaints sought recovery of all of the defendants' wrongfully obtained profits, not only those attributable to the plaintiffs; second, the disgorged funds were to be distributed *pro rata*. *See Durant*, 147 F.Supp.2d at 750 (requiring aggregation where plaintiffs "[sought] to recover per capita from a common fund into which the Defendants would disgorge ill-gotten gains, and one Plaintiff's failure to collect his share would result in a larger share for each remaining Plaintiff ...."); *In re Cardizem*, 90 F.Supp.2d at 826 (holding that plaintiffs had an undivided interest because the complaint sought an "all or nothing" recovery that did not depend on actual damages or vary with the number of plaintiffs in the class); *Aetna*, 48 F.Supp.2d at 41 (holding that the plaintiffs' claim for disgorgement should be aggregated because the claim was made "without reference to any actual damages sustained by any individual plaintiff").

In contrast, the class action plaintiffs in this case closely associate their disgorgement claims with actual damages attributable to each class member. In similar circumstances, courts have found such disgorgement claims to be personal. In *McCoy v. Erie Insurance Co.*, for example, plaintiffs sought restitution based on "monies paid by McCoy and members of the Class." 147 F.Supp.2d at 490. The district court held that the claims could not be aggregated because the individual class members were asserting rights arising from their individual contractual relationships with the defendants, and were seeking only the amount that each, individually, had been overcharged. *Id.* at 491; *see also Glover v. Johns–Manville Corp.*, 662 F.2d at 231 (claims should not be aggregated because "[Plaintiffs'] claims, while common in the sense that they appear to arise under similar circumstances, fail to have the undivided interest that is a necessary predicate to aggregation.") Similarly, in *Jones v. Allstate Insurance Co.*, 258 F.Supp.2d 424, 431 (D.S.C.2003), the district court held that the plaintiffs asserted "separate and distinct rights" because "each plaintiff [was] seeking to recover the amount the defendant gained on each individual insurance policy."

 Virden's complaint seeks to recover only those profits attributable to purchases of cigarettes "by the Plaintiff or the Class," not those earned by the defendants for all sales in West Virginia. Furthermore, his request for disgorgement is an alternative to an award of actual damages. The language in the complaint indicates that the defendants will be required to disgorge only profits obtained from sales to plaintiffs in this case, and that each plaintiff will recover only those profits attributable to him or her. Thus, the claims for disgorgement in this case are "separate and distinct" and should not be aggregated for purposes of satisfying the minimum jurisdictional amount.[2]

2. Neither Virden nor the defendants has presented evidence on the defendants' average profit per pack during the class period. The Court concludes that it need not determine an actual figure, however, because the remedy is an alternative to actual damages, and the defendants' profits attributable to Virden during the period necessarily will be less than the $36,500 the Court estimates Virden actually spent on cigarette purchases during the class period. The cost of a pack of cigarettes is attributable in part to the cost of production and distribution and in part to the company's profit. Because profits are only a component of the cost of a pack of cigarettes, the profits attributable to a given plaintiff will necessarily be less than the amount that plaintiff spent on cigarettes. Therefore, under the disgorgement remedy, each plaintiff will recover an amount smaller than the amount of actual damages.

## C.

### Attorney's Fees

 Virden seeks to recover the cost of his attorney's fees. The jurisdictional amount can be satisfied if his damages "exceed[ ] the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. Attorney's fees are included in the calculation of the jurisdictional amount, however, only if they are specifically provided for in the state statute at issue. *See Mo. State Life Ins. Co. v. Jones*, 290 U.S. 199, 202, 54 S.Ct. 133, 78 L.Ed. 267 (1933). Because the WVCCPA does not explicitly provide for attorney's fees, *see* W. Va.Code § 46A–6–106, the Court concludes that attorney's fees should be considered "costs" and excluded from the calculation of the jurisdictional amount in controversy.

## D.

### Punitive Damages

 Virden's complaint also seeks an award of punitive damages under the WVCCPA. The availability of punitive damages under the WVCCPA remains an open question under West Virginia law. *See Muzelak v. King Chevrolet*, 179 W.Va. 340, 368 S.E.2d 710, 714 (1988). The statute authorizes courts to award "actual damages or two hundred dollars, whichever is greater" and provides that "[t]he court may, in its discretion, provide such equitable relief as it deems necessary or proper." W. Va.Code § 46A–6–106(1).

The fact that the WVCCPA does not explicitly provide for punitive damages is not dispositive on the issue of the availability of that remedy. The West Virginia Supreme Court of Appeals has held that explicit statutory authorization of punitive damages is not required in all circumstances. In *Haynes v. Rhone–Poulenc, Inc.*, 206 W.Va. 18, 521 S.E.2d 331, 336 (1999), the court held that punitive damages were available under the West Virgi-

nia Human Rights Act, W. Va.Code § 5–11–13(c), despite the statute's silence on that issue. The court concluded that punitive damages were available because the Human Rights Act provided that a successful plaintiff could be awarded certain enumerated remedies as well as "any other legal or equitable relief as the court deems appropriate." *Haynes*, 521 S.E.2d at 345. The court reasoned that punitive damages were available because they effectuated the broader purposes of the Act and were encompassed in the term "any . . . legal . . . relief." *Id.*

The pertinent statutory language relied on in *Haynes* is not present in the WVCCPA. Specifically, the statute does not provide for "any other legal . . . relief." The only "legal remedies" provided for in the WVCCPA are actual damages and, alternatively, statutory damages. Although there is a provision in the WVCCPA giving courts discretion to award broad "equitable relief," that language does not support a finding that punitive damages are available. As noted in *Haynes*, punitive damages are a legal, not equitable, remedy. *Id.* Accordingly, the Court concludes that punitive damages are not available under the WVCCPA.

## E.

### Injunctive Relief

 Virden has not specifically requested injunctive relief. Nevertheless, his complaint seeks "any further relief which may be available to [the class] under said statute or the common law." As noted earlier, the WVCCPA specifically gives a court the discretion to order equitable relief "as it deems necessary and proper." W. Va.Code § 46A–6–106. The defendants claim that Virden's complaint may be construed to include costly injunctive relief, and they urge the Court to consider the language in the complaint as a request

for injunctive relief. They have not presented any concrete evidence as to the value or nature of the alleged claim for injunctive relief, however, and the Court declines to speculate about the cost of injunctive relief in its calculation of the amount in controversy.

### F.

#### *Total Amount in Controversy*

Virden's individual damages, the only damages the Court is to consider in calculating the jurisdictional amount, are no more than his actual damages of $36,500, an amount in controversy insufficient to establish federal diversity of citizenship jurisdiction.

### VII.

#### *CONCLUSION*

Based on the foregoing, the Court finds that it is without jurisdiction to hear plaintiff's claims and **ORDERS AS FOLLOWS**:

1) The plaintiff's motion to remand this action to Circuit Court is **GRANTED**;

2) This case is **REMANDED** to the Circuit Court of Hancock County, West Virginia, for further proceedings; and

3) This case is stricken from the docket of the Court.

The Clerk is directed to transmit copies of this Order to counsel of record by United States mail.